P.J. PERRINO, Jr., Trustee, Appellant,

v.

SALEM, INC., et al., Appellee.

No. 99–142–B–C.
Bankruptcy Nos. 98–1049, 96–10543.

United States District Court,
D. Maine.

Dec. 20, 1999.

Curtis E. Kimball, Rudman & Winchell, Bangor, Maine, for Mainley Payroll Inc. and Cliff Levesque, debtor.

Daniel L. Cummings, Norman, Hanson & Detroy, Portland, Maine, for Dorothy C. Levesque, debtor.

Rufus E. Brown, Brown & Burke, Portland, Maine, for PJ Perrino, Jr., appellant.

Louis H. Kornreich, James R. Wholly, Gross, Minsky, Mogul & Singal, P.A., Bangor, Maine, Submitted by: William S. Brownell, Clerk, U.S. District Court, Portland, Maine, for Salem Inc., appellee.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Appellant P.J. Perrino, Jr., Trustee of the Consolidated Estates ("Trustee") of Mainely Payroll, Inc. ("MPI"), Clifford Levesque ("Levesque"), and Dorothy Levesque, pursuant to 11 U.S.C. § 158(c), appeals from the United States Bankruptcy Court's ("Bankruptcy Court") Memorandum of Decision ("Decision") (Record E), rendered on May 4, 1999. *See* Notice of Docketing Bankruptcy Appeal (Docket No. 1). Specifically, Trustee appeals the Bankruptcy Court's determination in its Decision that the appellee Salem, Inc. ("Salem"), pursuant to 11 U.S.C. § 550(a)(1) of the Bankruptcy Code, was not the "initial transferee" of funds that were fraudulently transferred from MPI, to Salem, on March 26, 1996. *See* Adversary Complaint ("Complaint") (Record 1).

After a review of the parties' arguments (*see* Brief of Appellant P.J. Perrino, Trustee (Docket No. 4); Brief of Appellee Salem, Inc. (Docket No. 6)) and the Bankruptcy Court's Decision, the Court finds that the Bankruptcy Court's legal conclusion that Salem was not the "initial trans-

feree" of MPI's funds, pursuant to § 550(a)(1) of the Bankruptcy Code, was erroneous. Therefore, the Court will reverse the Bankruptcy Court's Decision, and the case will be remanded to the Bankruptcy Court for entry of judgment in favor of Trustee.

## BACKGROUND

On May 21, 1998, Trustee of the Consolidated Estates of MPI, Clifford Levesque and Dorothy Levesque, filed a complaint against various entities and individuals to recover funds that were allegedly fraudulently transferred from MPI after MPI became insolvent in 1996. *See* Complaint. The present appeal, however, concerns only Trustee's claim against Salem, brought pursuant to 11 U.S.C. § 548 of the Bankruptcy Code. *Id.* Trustee's claim against Salem arises from the following facts.

Clifford Levesque was the president, director, and a stockholder of MPI, a payroll service located in Augusta, Maine. Decision at 3. Levesque's management of MPI was exclusive. *Id.* As a normal method of doing business, MPI calculated its client's payroll expenses and then collected from that client the funds necessary to cover those expenses. *Id.* MPI would then deposit the collected client funds into a bank account (the "MPI payroll account") it maintained at Fleet Bank of Maine ("Fleet"). *Id.*

Beginning in the Fall of 1993, however, Levesque began to use the MPI payroll account as if it were his own personal bank account. Decision at 3. Levesque's conduct ultimately caused himself, and MPI, to declare bankruptcy in May of 1996. *Id.* Two months before Levesque and MPI declared bankruptcy Levesque directed MPI to purchase a $31,084.06 cashier's check from Fleet with funds drawn on the MPI payroll account. *Id.* Levesque directed Fleet to make the cashier's check payable to Salem, a corporate automobile dealership doing business in Naugatuck,

Connecticut. *Id.* Levesque also ordered that Fleet list Bond Brook Motors ("Bond Brook"), an automobile dealership located in Augusta, Maine, as the remitter on the face of the cashier's check. *Id.* At the time the cashier's check was issued, Michael Levesque, the son of Clifford Levesque, was a principal of Bond Brook. *Id.*

As directed, on March 25, 1996, Fleet issued the cashier's check to MPI. Decision at 14. The next day, MPI delivered the cashier's check to Bond Brook. *Id.* at 17. In turn, Bond Brook delivered the cashier's check to Salem in exchange for a 1996 Chevrolet Tahoe. *Id.* at 17, 19–20. As stated above, however, two months after the transaction, MPI filed for bankruptcy. *Id.* at 4. Furthermore, there is no dispute but that at the time of the foregoing transaction, MPI was insolvent. *Id.* Based upon the foregoing, Trustee brought a fraudulent transfer claim against Salem.

## DISCUSSION

### I. *Trustee's Claim Against Salem*

Trustee's claim against Salem is predicated upon 11 U.S.C. § 548(a)(1) of the Bankruptcy Code which "sets forth the powers of a trustee in bankruptcy to avoid fraudulent transfers." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556 (1994). Specifically, § 548 provides in relevant part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such a transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted, or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and. . . .

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. . . .

Here, the parties have stipulated to the following facts: (1) MPI transferred funds to Salem; (2) within one year of MPI's voluntary petition for bankruptcy; (3) MPI was insolvent at the time of the transfer; and (4) MPI received "less than reasonably equivalent value (nothing) in return." Decision at 6. Thus, the parties in this case agree that the requirements of § 548(a)(1) were satisfied.

■ Recovery under § 548(a)(1), however, is limited to the "initial transferee" or the "immediate or mediate transferee" of fraudulently transferred funds. *See* 11 U.S.C. § 550(a)(1) and (2). Section 550 of the Bankruptcy Code provides in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) the trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

Under § 550(a)(1), a "trustee's right to recover from an 'initial transferee' is absolute." *Cohen v. Abele*, 236 B.R. 1, 4–5 (9th

Cir. BAP 1999). Section 550(b), however, "prohibits recovery from immediate or mediate transferees who take for value, in good faith, and without knowledge of the voidability of the transfer avoided." *Id.* at 4–5 (quotation marks omitted). Thus, in an action such as this, whether a transferee depends entirely upon the transferee's status under § 550 of the Bankruptcy Code.

The Bankruptcy Court found, and there is no doubt, that Salem, having taken possession of MPI's cashier's check and negotiated it, became a "transferee" of MPI's funds. Decision at 7. The only real issue before the Bankruptcy Court was whether Salem was the "initial transferee" of MPI's funds under § 550(a)(1), or whether it was an "immediate or mediate transferee" under § 550(a)(2). For if Salem was not the initial transferee of MPI's funds, then it had valid defenses to Trustee's § 548 claim pursuant to 11 U.S.C. § 550(b). *See* Decision at 8–9. Conversely, if Salem was the initial transferee of MPI's funds under § 550(a)(1), then Salem's liability to Trustee in this action is strict. *Id.* at 8.

In its Decision, the Bankruptcy Court found that Salem was not the initial transferee of MPI's funds; rather, the Bankruptcy Court found that Bond Brook was the initial transferee of MPI's funds. *See* Decision at 20, 27. Therefore, as a result of the parties' stipulation of facts, Salem, as a "mediate transferee" of MPI's funds, had valid defenses to Trustee's claim under § 550(b), and the Bankruptcy Court rendered judgment in favor of Salem on Trustee's claim. *Id.* Trustee has appealed that finding of the Bankruptcy Court.

## II. *The District Court's Standard of Review*

In reviewing a decision of a bankruptcy court, the district court "must accept the bankruptcy judge's findings of fact unless they are clearly erroneous." *In re Public Service Co. of New Hampshire,* 848 F.Supp. 318, 323 (D.R.I.1994), *aff'd,* 43 F.3d 763 (1st Cir.1995), *cert. denied, Rochman v. Public Service Co. of New Hampshire,* 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 850 (1995). On the other hand, the district court affords *de novo* review to the bankruptcy court's conclusions of law. *Prebor v. Collins (In re I Don't Trust),* 143 F.3d 1, 3 (1st Cir.1998).

The Court finds that none of the Bankruptcy Court's factual conclusions, or inferences therefrom for that matter, are clearly erroneous. This Court's conclusion is based upon a careful review of the facts found by the Bankruptcy Court, as well as a recognition that the parties originally submitted this case for determination on a stipulated record. *See* Decision at 1. Consequently, there is no reason whatsoever for this Court to disturb any factual findings of the Bankruptcy Court. The Court's review of the Bankruptcy Court's Decision, therefore, will be limited to the Bankruptcy Court's conclusions of law.

## III. *The Bankruptcy Court's Decision*

In reaching its Decision, the Bankruptcy Court made several important conclusions of law. First, the Bankruptcy Court concluded that federal law governs whether a transfer is subject to avoidance under the Bankruptcy Code. Decision at 10. The Bankruptcy Court also found that in order to determine whether the transfer was voidable in this case, an examination of what property interests MPI, Fleet, Bond Brook, and Salem obtained in the course of the transaction was required, and that such a determination was accomplished by reference to state law. *Id.* The Court finds no error as to either of these two legal conclusions. *See Barnhill v. Johnson,* 503 U.S. 393, 397, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992); *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Thus, the Court need not address these issues any further.

Of greater significance to this appeal, however, was the Bankruptcy Court's decision to follow the so-called "dominion test" for transferee status under 11 U.S.C. § 550(a)(1) as set forth in *Bonded Financial Serv., Inc. v. European American*

*Bank,* 838 F.2d 890 (7th Cir.1988). Decision at 10. With regard to this critical determination, the Court finds that the Bankruptcy Court's decision to follow *Bonded* was well-considered.

As the Bankruptcy Court correctly noted in its Decision, the First Circuit has yet to address transferee status under § 550 of the Bankruptcy Code. Moreover, the Bankruptcy Court correctly recognized that the *Bonded* decision is widely regarded as setting forth the definitive statement of the law with regard to transferee status under § 550 of the Bankruptcy Code. *See* Decision at 10–11; *see also In re Finley,* 130 F.3d 52 (2d Cir.1997), *cert. dismissed,* 524 U.S. 912, 118 S.Ct. 2295, 141 L.Ed.2d 154 (1998); *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.),* 127 F.3d 1195 (9th Cir.1997). Consequently, because there is no authority in this jurisdiction regarding the proper interpretation of § 550, and since *Bonded* appears to be universally accepted as the unequivocal statement of the law on the interpretation issue, the Bankruptcy Court's decision to follow *Bonded* was certainly prudent.

Indeed, in this appeal, the court finds absolutely no fault with regard to the *framework* by which the Bankruptcy Court analyzed Trustee's claim; it is only to the Bankruptcy Court's *legal application* principles within of that framework that the Court finds to be in error. Specifically, the Court finds as error the Bankruptcy Court's legal determinations that: (1) in general, remitters are entitled to enforce cashier's checks; (2) Bond Brook was entitled to enforce MPI's cashier's check; and (3) Bond Brook had dominion over MPI's funds. As will be discussed below, these findings are not supported by applicable state law.

### IV. The Bankruptcy Court's Analysis and Voidable Transfers

█ As stated previously, the Bankruptcy Court followed the *Bonded* decision in its analysis of whether Salem was the "initial transferee" of MPI's funds under § 550 of the Bankruptcy Code. Decision at 10–11. In *Bonded,* the court stated: "Although the Bankruptcy Code does not define 'transferee,' and there is no legislative history on the point, we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded,* 838 F.2d at 893. "Dominion" over funds or assets, the *Bonded* court further explained, essentially means that a party must be "free to invest [the assets] in lottery tickets or uranium stocks." *Id.* at 894. Therefore, under *Bonded,* if a party exercises dominion or control over transferred funds, then that party is a transferee within the meaning of § 550 of the Bankruptcy Code; conversely, a party that does not exercise dominion over funds is merely a "conduit" of the assets. *See Id.* at 893–94; *Rupp v. Markgraf,* 95 F.3d 936, 938–39 (10th Cir.1996).

With the foregoing definition of "transferee" in mind, the Bankruptcy Court in its Decision analyzed the potential transferee statuses of Levesque, Fleet, Bond Brook, and Salem. Decision at 20, 20 n. 16, 21. In the end, the Bankruptcy Court concluded that Levesque and Fleet were not transferees in this case because they never had dominion over MPI's funds. *See* Decision at 20 n. 16. The Bankruptcy Court further concluded that Bond Brook was the initial transferee of MPI's funds because Bond Brook was the first entity that could have put MPI's funds to its own use. Decision at 20. Finally, the Bankruptcy Court concluded that Salem was only a mediate transferee of MPI's funds because it exercised dominion over MPI's funds only after Bond Brook had already done so. *Id.* at 20.

### V. Remitters and the Maine Commercial Code

The Bankruptcy Court's legal conclusion that Bond Brook was the initial transferee in this action was predicated upon its determination that Bond Brook had the ability to put MPI's funds, represented by the cashier's check issued by Fleet, to its own

use. Decision at 20–21. That conclusion was based largely upon the Bankruptcy Court's reading of the Maine Commercial Code ("MCC") with regard to negotiable instruments. See 11 M.R.S.A. § 3–1101 et seq. As will be discussed below, however, the Bankruptcy Court's MCC analysis is flawed. Presently, in light of the de novo nature by which this Court must review the Bankruptcy Court's legal conclusions, the Court will conduct its own review of the subject transaction under the MCC.[1] Because of the complexity of the following analysis, however, the Court · has addressed each entities' interest in MPI's funds separately under the MCC.

### A. MPI's Interest in the funds

■ The facts show that on March 25, 1996, Levesque directed MPI to purchase a cashier's check from Fleet, payable to Salem, with funds drawn on the MPI payroll account. Decision at 14. As a result of that purchase, MPI became the remitter of the cashier's check. Pursuant to 11 M.R.S.A. § 3–1103(1)(k), a "remitter" is defined as a "person who purchases an instrument from its issuer if the instrument is payable to an identified person other than the purchaser."[2] Here, under the MCC, MPI, as the entity that purchased the cashier's check from Fleet, was the remitter of that negotiable instrument.[3]

For its part, Fleet was the drawer, see 11 M.R.S.A. § 3–1103(1)(c) ("drawer" is a "person who signs or is identified in a draft as a person ordering payment"), drawee, see § 3–1103(1)(b) (" 'drawee' means a person ordered in a draft to make a payment"), and issuer, see § 3–1105(3) ("issuer" is "a maker or drawer of an instrument") of the cashier's check, see § 3–1104(7) ("cashier's check" is "a draft with respect to which the drawer and drawee are the same bank or branches of the same bank"). Moreover, Fleet "issued" the cashier's check to MPI because it first delivered that instrument to MPI, a nonholder, for the purpose of giving Salem rights in the instrument. See 11 M.R.S.A. § 3–1105(1) ("issue" means "the first delivery of an instrument by the maker or drawer, whether to a holder or nonholder, for the . purpose of giving rights on the instrument to any person"). Also, MPI was a nonholder of the cashier's check because, although MPI was in possession of the instrument, the instrument was payable specifically to Salem. See 11 M.R.S.A. § 1–201(20) ("[h]older with respect to a negotiable instrument means the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession"). Furthermore, Salem had rights in the instrument because the instrument was pay-

1. As the Bankruptcy Court noted in its Decision, "Maine's adaptation of Article 3 is unexceptional," and as such, this Court, like the Bankruptcy Court before, will "draw on the rubric of U.C.C. Article 3 analysis." Decision at 14 n. 9.

2. A "person" under the Maine Commercial Code "includes an individual or an organization." 11 M.R.S.A. § 1–201(30). MPI, as a corporation of "organization," therefore, qualifies as a "person" under the Code. Additionally, the term "instrument" also means "a negotiable instrument." See 11 M.R.S.A. § 3–1104(2).

3. Pursuant to 11 M.R.S.A. § 3–1104 of the MCC, a "negotiable instrument" is:
    (1) . . . an unconditional promise or order to pay a fixed amount of money, with or

without interest or other charges described in the promise or order, if it:
    (a) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
    (b) Is payable on demand or at a definite time; and
    (c) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money. . . .
·Neither the parties nor the Bankruptcy Court questioned the negotiability of the cashier's check, and this Court has an insufficient factual basis to question the negotiability of the instrument. Therefore, the Court will proceed under the assumption that the instrument was negotiable. See Decision at 14.

able to Salem. *See* 11 M.R.S.A. § 3–1109(2) (promise or order to pay is payable to order of an identified person). Finally, Fleet delivered the cashier's check to MPI because it voluntarily transferred possession of the instrument. *See* 11 M.R.S.A. § 1–201(14) ("[d]elivery with respect to an instrument ... means voluntary transfer of possession"). In sum, therefore, at this stage of the transaction. Fleet was the issuer, drawer, and drawee of the cashier's check. Salem was the payee of the cashier's check, and MPI was the remitter of the instrument. Also, Fleet had issued the cashier's check to MPI, a nonholder of the instrument.

■ Up to this point, the Court's analysis of the subject transaction is consistent with the Bankruptcy Court's findings. It is here, however, that the Court and the Bankruptcy Court part ways. Specifically, the Bankruptcy Court found that MPI, the remitter of the cashier's check, had the ability to "enforce" the instrument; that is, "to make Fleet, as issuer, pay the instrument." Decision at 15. The Court finds that the Bankruptcy Court's conclusion is contrary to the MCC.

In support of its finding that MPI could enforce the cashier's check, the Bankruptcy Court cited two sections of the MCC, *see* 11 M.R.S.A. §§ 3–1301(2) and 3–1412, numerous decisions from other jurisdictions, as well as a law review article. *See* Decision at 15–17 (citing *Hall–Mark Electronics Corp. v. Sims (In re Lee)*, 179 B.R. 149, 161 (9th Cir. BAP 1995), *aff'd*, 108 F.3d 239 (9th Cir.1997); *Rupp*, 95 F.3d at 936; *In re Mora*, 218 B.R. 71, 75 (9th Cir. BAP 1998); *Kendall v. Sorani (In re Richmond Produce Co.)*, 151 B.R. 1012, 1017 (N.D.Cal.1993), *aff'd*, 195 B.R. 455 (N.D.Cal.1996); Gregory E. Maggs, *Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions*, 36 B.C.L.Rev. 619 (1995)). But, as will be discussed below, the Bankruptcy Court's finding that MPI could enforce the cashier's check is not supported by the MCC and other authorities cited above.

As discussed above, MPI was the remitter of the cashier's check issued by Fleet. Yet, the MCC does not directly state whether a remitter may enforce a cashier's check. *See also* Decision at 15 n. 11. Nevertheless, the official commentary to the MCC does address the issue. Specifically, the official commentary to 11 M.R.S.A. § 3–1312, regarding lost, destroyed, or stolen cashier's checks, states that § 3–1309 of the MCC "applies *only to persons entitled to enforce [a] check. It does not apply to a remitter of a cashier's check....*" 11 U.S.C. § 3–1312 cmt. 1 (emphasis added). Moreover, the MCC's view that a remitter may not enforce a cashier's check has been widely recognized by other scholarly works as the correct statement of the law. *See* 6 Hawkland, [Rev.] § 3–103:2 (because remitter not payee of cashier's check, remitter not entitled to enforce the instrument); 11 Am.Jur.2d *Bills & Notes* § 308 (1997) (remitter not entitled to enforce cashier's check); Timothy R. Zinnecker, *A Literalist Proposes Four Modest Revisions to U.C.C. Article 3*, 32 U.Rich.L.Rev. 63, 101 (1998) (purchaser of cashier's check, which was not payable to purchaser, not entitled to enforce instrument). Consequently, although there is no specific section under the MCC that expressly deals with a remitter's ability to enforce a cashier's check, the Code is not altogether silent on the issue. Indeed, there is, at a very minimum, an acknowledgment by the Code drafters, as well as many other leading scholars, that a remitter, because of its unique relationship vis-a-vis a cashier's check, is not entitled to enforce that instrument.[4]

---

4. The Court infers that the reason that the MCC states that a remitter cannot enforce a cashier's check is because a remitter is not a party to the instrument. *See* 11 M.R.S.A. § 3–1201 cmt. 2 (remitter not a party to cashier's check); 6 William D. Hawkland & Lary Lawrence, Uniform Commercial Code Series [Rev.] § 3–103:2 (1998) ("Hawkland") (remitter of cashier's check not party to instrument); Henry J. Bailey & Richard B. Hager-

Notwithstanding the foregoing, however, the Bankruptcy Court concluded that MPI, though not a holder of the cashier's check, could enforce the instrument against Fleet. Decision at 15. In so finding the Bankruptcy Court relied upon 11 M.R.S.A § 3–1301(2) as support for its conclusion. Section 3–1301 provides as follows:

"Person entitled to enforce" an instrument means:

(1) The holder of the instrument;

(2) A nonholder in possession of the instrument who has the rights of a holder . . . .

As previously discussed, MPI was not a holder of the cashier's check because even though MPI was in possession of the instrument, the instrument was payable to Salem. *See* 11 M.R.S.A. § 1–201(20). Clearly, therefore, MPI was not entitled to enforce the instrument under § 1–1301(1).

Consequently, the only other way in which MPI, as a nonholder of the cashier's check, could have enforced the instrument was via § 3–1301(2). MPI's ability to enforce the cashier's check under § 1–1301(2), however, was dependent entirely upon whether MPI was a "transferee" in possession of the instrument under 11 M.R.S.A. § 3–1203(1) and (2). *See F.D.I.C. v. Houde*, 90 F.3d 600, 605 (1st Cir.1996). Section 3–1203, which is entitled "Transfer of Instrument; rights acquired by transfer," provides in pertinent part:

(1) An instrument is transferred when it is *delivered by a person other than its issuer* for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(2) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument . . .

don, Brady On Bank Checks ¶ 1.17 (7th Ed.1992) ("The purchaser is not a party to the cashier's check itself unless named as a payee . . . .") Therefore, under the MCC, because a remitter is not a party to the instrument it has

(Emphasis added).

Under the parties' transaction, however, Fleet never "transferred" the cashier's check to MPI; rather, Fleet, as issuer of the instrument, issued the cashier's check to MPI. Therefore, because Fleet did not "transfer" the instrument to MPI within the meaning of § 3–1203(1), MPI was not a "transferee" of the instrument to MPI within the meaning of § 3–1203(2). In turn, since MPI was not a transferee of the instrument under § 3–1203(2), MPI was prevented from being a nonholder in possession of the instrument with the rights of holder, MPI was not entitled to enforce the instrument pursuant to § 3–1301(2). Consequently, the Bankruptcy Court erred in its finding that MPI was entitled to enforce the cashier's check under the MCC.

Furthermore, the decisions cited by the Bankruptcy Court in its Decision do not support the proposition that a remitter may enforce a cashier's check. Rather, those cases deal only with a remitter's *ownership rights* in an instrument under ordinary principles of property law; the cases do not address a remitter's ability *to enforce* an instrument under an applicable commercial code. *See, e.g., Hall–Mark Electronics Corp.*, 179 B.R. at 161; *Rupp*, 95 F.3d at 936. In this case, there is no question that Fleets issuance of the cashier's check to MPI created in MPI a property right in that instrument. *See* 11 M.R.S.A. § 1202 cmt. 2 ("remitter, although not a party to the check, is the owner of the check until the ownership is transferred . . . by delivery"); 11 M.R.S.A. § 3–1203 cmt. 1 (ownership rights in instruments may be determined by principles of property law independent of Article 3); *see also* Hawkland, § 3–104:16. Yet, there is a clear distinction between the ability to enforce a negotiable instrument

no enforcement rights in the instrument. *See* 11 M.R.S.A. § 3–1109(2). Here, only Fleet as the drawer and drawee of the cashier's check, and Salem, as payee, were parties to the instrument. *See* 6 Hawkland [Rev.] § 3–1–3:2.

under the commercial code and the legal right of possession of that instrument.

The right to enforce an instrument and ownership of the instrument are two different concepts. A thief who steals a check payable to bearer becomes the holder of the check and a person entitled to enforce it, but does not become the owner of the check....Ownership rights in instruments may be determined by principles of the law of property, independent of Article 3, which do not depend upon whether the instrument was transferred under Section 3–203. Moreover, a person who has an ownership right in an instrument might not be a person entitled to enforce the instrument.

11 U.S.C. § 3–1203 cmt. 1.

Thus, even though MPI had ownership rights in the cashier's check, it was not entitled to enforce the instrument under the MCC.

Based upon the foregoing, the Bankruptcy Court erred in its determination that MPI could enforce the cashier's check. Consequently, the Court will examine the legal ramifications of that error with regard to the remainder of transaction.

B. *Bond Brook's Interest in the Funds*

■ Following the Bankruptcy Court's determination that Fleet had issued the cashier's check to MPI, the Bankruptcy Court found that MPI had delivered the instrument to Bond Brook, "the entity named as a remitter on the face of the check." Decision at 17. It is clear, however, that pursuant to 11 M.R.S.A. § 3–1103(1)(k), as a matter of law, Bond Brook was not a remitter of the cashier's check. Bond Brook neither purchased the instrument from Fleet, nor did Fleet issue the instrument to Bond Brook. *Id.* Thus, the requirements of § 3–1103(1)(k) were obviously not met.

Nevertheless, MPI, by voluntarily giving the instrument to Bond Brook, "delivered" the instrument to Bond Brook. *See* 11

M.R.S.A. § 1–201(14). That delivery, however, as the Bankruptcy Court correctly concluded in its Decision, was not a "negotiation" of the instrument. See Decision at 18. Pursuant to 11 M.R.S.A. § 3–1201, "negotiation" means:

(1) a transfer of possession, whether voluntary or involuntary, or an instrument by a person other than the issuer to a person who thereby becomes its holder.

Here, MPI's delivery of the cashier's check to Bond Brook was not a "negotiation" because Bond Brook, as a nonpayee of the instrument, did not become a holder of the instrument upon delivery. *See* 11 M.R.S.A. § 3–1201(1). Consequently, since Bond Brook was not a holder of the instrument under § 3–1301(1), it was not entitled to enforce that instrument pursuant to that subsection of § 3–1301.

In its Decision, however, the Bankruptcy Court found that Bond Brook was entitled to enforce the cashier's check under § 3–1301(2), as a "nonholder of the instrument" with the rights of a holder, because the instrument had been "transferred" from MPI to Bond Brook pursuant to § 3–1203(1) and (2). Decision at 17–19. Specifically, in its Decision, the Bankruptcy Court found that Bond Brook "received MPI's 'rights' on the instrument," pursuant to § 3–1105(1), "and was entitled to 'enforce' the instrument," pursuant to § 3–1301(2). *See Id.* at 19. Assuming, however, for purposes of argument here, that MPI intended to deliver the cashier's check to Bond Brook for the purpose of giving Bond Brook the right to enforce the instrument, the court finds that Bond Brook, as a matter of law, could not have acquired any rights from MPI to enforce the instrument. *See* Decision at 18 n. 14.

It has already been established that MPI's delivery of the cashier's check to Bond Brook was not a negotiation and, as a result, a "transfer" of the instrument must have occurred, if at all, under § 3–

1203(2).[5] Section 3–1203(2) provides, in pertinent part, that a "[t]ransfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument...." Therefore, under the plain language of § 3–1203(2), MPI could only transfer to Bond Brook any rights to enforce the cashier's check *which it itself had as a transferor. See* 11 U.S.C. § 3–1203 cmt. 2 ("[T]ransfer [pursuant to § 3–1203(2) ] vests in the transferee any right of the transferor to enforce the instrument ... If the transferee is not a holder ... the transferee is nevertheless a person entitled to enforce the instrument under Section 3–301 *if the transferor was a holder at the time of transfer* ") (emphasis added); *see also Houde,* 90 F.3d at 605 (under the MCC, to be a nonholder in possession of instrument with rights of holder, transferee must receive instrument from a holder). Here, as discussed above, MPI was not a holder of the cashier's check. Thus, it had no right to enforce the instrument. Furthermore, since MPI had no right to enforce the instrument, necessarily, Bond Brook could not have acquired such a right from MPI.

Consequently, because MPI had no enforcement rights which it could have transferred to Bond Brook pursuant to § 3–1203(2), Bond Brook was not entitled to enforce the instrument.[6] Therefore, contrary to the Bankruptcy Court's conclusion

in its Decision, Bond Brook, as a matter of law, was not a "nonholder in possession" of the instrument with the rights of a holder under § 3–1301(2).

### C. *Salem's Interest in the Funds*

▋ Finally, to finish the Court's analysis of the entities' transaction, after the Bankruptcy Court found that MPI had delivered the cashier's check to Bond Brook, the Bankruptcy Court further found that Bond Brook delivered the instrument to Salem. Decision at 21. That delivery constituted a transfer and a negotiation because Salem, as the payee of the instrument, became a holder of the instrument. *Id.; see* §§ 3–1201(1), 3–1203(1). Furthermore, because Salem was the holder of the instrument, it was entitled to enforce the cashier's check. *See* §§ 1–201(20), 3–1301(1).

### VI. *Dominion over MPI's funds*

▋ With the Court's discussion of the relevant entities property rights in the cashier's check completed, the Court turns its attention to Trustee's fraudulent transference claim under federal law. In its Decision, the Bankruptcy Court found that because Bond Brook had exercised dominion over MPI's funds, it was the initial transferee of those funds pursuant to 11 U.S.C. § 550(a)(1). As discussed above, however, under the MCC, Bond Brook was not able to enforce MPI's cashier's check.

---

**5.** Unlike Fleet's delivery of the cashier's check to MPI, MPI's delivery of the cashier's check to Bond Brook possibly may have have constituted a "transfer" under 11 M.R.S.A. § 3–1203(1) because MPI, unlike Fleet, was not the "issuer" of the instrument.

**6.** The Court also disagrees with the Bankruptcy Court's conclusion that Bond Brook, as "named remitter" and "successor to MPI's interests in the instrument," also succeeded to MPI's § 3–1312 rights to a claim in the event of loss, destruction, or theft of the cashier's check. *See* Decision at 19 n. 15. Because the purpose of § 3–1213 is to relieve a bank from "having to determine the rights of some person ... *with whom the bank [has] not dealt,*" § 3–1312 cmt. 2, it stands the section on its head to argue that Bond Brook, a party with

whom Fleet had never dealt, could make a claim on the cashier's check in the event that it became lost, destroyed or stolen.

Additionally, the Bankruptcy Court's statement that, if a remitter is not entitled to enforce a cashier's check, then MCC transfer warranties are violated each time a remitter transfers an instrument to the payee is not entirely accurate. Pursuant to 11 M.R.S.A. § 3–416(a), "a person who transfers an instrument *for consideration* shall warrant to the transferee ... that [t]he warrantor is a person entitled to enforce the instrument...." (Emphasis added). Here, MPI received no consideration from Bond Brook in exchange for the cashier's check. Thus, in this case, no MCC transfer warranties were violated.

Therefore, it had no way of exercising any "dominion" over MPI's funds. Specifically, Bond Brook had no way of turning MPI's $31,084.06, as represented by the cashier's check, into "lottery tickets or uranium stocks." *Bonded,* 838 F.2d at 893. The fact that Bond Brook had the ability, as the Bankruptcy Court states in its Decision, to negotiate the cashier's check to Salem in exchange for the Tahoe is not sufficient to satisfy the test for "dominion" under *Bonded. See* Decision at 21. n. 17. In fact, Bond Brook could not have done anything else with the cashier's check other than to exchange it with Salem; yet, that type of limited discretion with respect to transferred funds falls far short of the type of financial freedom discussed in the *Bonded* decision. Under *Bonded* and its progeny, in order to exercise dominion over funds or assets, a party must be free to use transferred proceeds in an manner which allows for unfettered disposition of those funds. *See Bonded,* 838 F.2d at 893; *Rupp,* 95 F.3d at 939; *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 904 F.2d 588, 599–600 (11th Cir. 1990). Indeed, the court's statement in *Bonded* that a party must be "free to invest the whole [amount of the transferred funds] in lottery tickets or uranium stocks" was not simply, as the Bankruptcy court characterized, "an off-the-cuff remark," *see* Decision at 21 n. 17, with regard to a transferee's ability to use funds; rather, it was a calculated statement intended to demonstrate the high degree of freedom necessary to achieve dominion over transferred funds.

■ Therefore, this Court finds, following the court's analysis in *Bonded,* that Bond Brook was merely a courier of MPI's funds. It has been well established, however, that "those who act as mere 'financial intermediaries' or 'couriers' are not initial transferees under § 550." *Bonded,* 838 F.2d at 893. Furthermore, even though a courier has some limited degree of control over transferred funds, that control alone "amounts to nothing more than the ability to defeat the [payee's] 'right to put the money ... to [its] own purposes.'" *Rupp,* 95 F.3d at 941 (citing *Bonded,* 838 F.2d at 893). Yet, such control does not constitute dominion under the rationale of *Bonded. Id.; Bonded,* 838 F.2d at 893.

■ Based upon the foregoing, the Court finds that Bond Brook did not exercise any dominion over MPI's funds, and as a result, Bond Brook was not a transferee of MPI's funds under 11 U.S.C. § 550(a).[7] Conversely, in light of the foregoing, the Court finds that Salem was the first entity to . exercise dominion over MPI's funds. Therefore, pursuant to § 550(a)(1), Salem was the "initial transferee" in the subject transaction and, as a result, under 11 U.S.C. §§ 548 and 550 of the Bankruptcy Code, Salem is strictly liable to Trustee.[8]

7. The Court also disagrees with the Bankruptcy Court's statement in its Decision that "Fleet would be obligated to give Bond Brook the funds represented by the check if Bond Brook elected not to purchase the Tahoe from Salem in light of the (readily apparent) expectations of the parties held, without reference to Article 3." Decision at 25.

The Court is not certain that MPI, much less Bond Brook, could have reacquired the funds represented by the cashier's check after it had purchased the cashier's check from Fleet. The MCC does not address whether a remitter can stop payment on a cashier's check and reacquire funds. Most courts, however, have found that a cashier's check is an item that is accepted in advance through the act of its issuance and, therefore, it is not subject to countermand by either a remitter or the issuing bank. *See Sainz Gonzalez v. Banco de Santander–Puerto Rico,* 932 F.2d 999, 1003 n. 6 (1st Cir.1991); *Center Video Indus. Co., Inc. v. Roadway Package System, Inc.,* 90 F.3d 185, 188 (7th Cir.1996); *see also* Hawkland at § 3–104:16. Here, however, it is unnecessary for the Court to address this issue because, as stated above, Bond Brook was not the remitter of the cashier's check. Furthermore, even if Fleet had for some reason honored Bond Brook's request to countermand the cashier's check, the instrument was paid for by funds from *MPI's payroll account,* not from any account of Bond Brook. Thus, the funds would have been credited to MPI's account over which Bond Brook had no control.

## CONCLUSION

█ Although the Court's decision appears to undermine the fairness and justice of the Bankruptcy Court's Decision, insofar as Salem is concerned, the result is dictated by the rigidity of the Bankruptcy Code. The Bankruptcy Code "leaves no room to fashion a remedy that treats initial transferees 'equitably' under the circumstances of any given case." Decision at 8 n. 7; *see Bowers v. Atlanta Motor Speedway, Inc. (In re Southeast Hotel Properties Ltd.),* 99 F.3d 151, 157 (4th Cir.1996). "Congress has already balanced the equitable considerations under § 550 by distinguishing between initial transferees, who are strictly liable, and subsequent transferees, who are not strictly liable." *Rupp,* 95 F.3d at 944. "Congress has made its own judgment of who should bear the risk of loss ... when it enacted [s]ection 550, and [the court is] bound to accept that judgment." *Id.*

Accordingly, the judgment of the Bankruptcy Court is reversed, and the matter is remanded for entry of judgment in favor of Trustee on Count VI of the Complaint.

**IT IS SO ORDERED.**

---

8. The Court notes that this finding accords with both the Bankruptcy Code and applicable case law. "Section 550(a)(1) subjects to strict liability not only the initial transferee, but also 'the entity for whose benefit such transfer was made.'" *Rupp,* 95 F.3d at 943; 11 U.S.C. § 550(a)(1). "'The implication is that the entity for whose benefit the transfer was made is different from a transferee, immediate or otherwise.'" *Rupp,* 95 F.3d at 943 (citing *General Electric Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.),* 185 B.R. 801, 809 (9th Cir. BAP 1995).)

Under the Bankruptcy Court's Decision, Bond Brook was both the "initial transferee" and "the entity for whose benefit" the transfer was made. *See* Decision at 22 n. 19, 27. That conclusion, however, it at odds with the "implication" that the initial transferee cannot be the "entity for whose benefit" the transfer was made. Conversely, the Court's conclusion that Salem is the initial transferee of MPI's fund, and Bond Brook is the entity for whose benefit the transfer was made, is entirely consistent with the Bankruptcy Code.