TALLMAN, Circuit Judge.
 

 In a case of first impression in this Circuit we are called upon to determine whether the person listed on the purchaser line of a cashier’s check exercises dominion over the funds for the purpose of determining who may be subject to a voidable preference in a bankruptcy adversary action. Robert P. Abele, the debtor’s Trustee, seeks to avoid a fraudulent transfer, under 11 U.S.C. § 548, which was made to settle a debt owed to appellee Modern Financial Plans Services (“Modern”) by the debtor’s husband. The debtor, Cynthia Cohen (“Cynthia”) assisted her husband by purchasing a cashier’s check payable to Modern (with separate funds not listed as an asset in her husband’s bankruptcy), and designating her husband, Jeffrey Cohen (“Jeffrey”), as the purchaser on the face of the check.
 

 The Trustee appeals the district court’s decision affirming the bankruptcy court’s judgment in Modern’s favor. The district court held that Jeffrey was the initial transferee of the funds and that Modern was the subsequent transferee who accepted the funds in good faith, pursuant to 11 U.S.C. § 550(b). We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291, and we reverse and remand. We hold that Modern was the initial transferee of the funds and is, therefore, strictly liable to the Trustee.
 

 I
 

 The facts of this case are not in dispute. In 1990, Jeffrey purchased a mobile home for approximately $90,000. Modern financed a third of the purchase price, and obtained a security interest in it. Jeffrey sold the mobile home in 1991, but failed to repay the loan. Modern subsequently filed an action for damages and replevin against Jeffrey and the buyer. Instead of responding to the lawsuit, Jeffrey filed his own chapter 7 petition in July 1996.
 

 In August 1996, Modern proposed a Reaffirmation Agreement in which Jeffrey would pay $15,000 on or before September 13, 1996, and $5,000 in thirty-six monthly installments. Because of Jeffrey’s financial instability, the Agreement required Cynthia to guarantee the $5,000 deferred payment. Jeffrey, again, failed to pay Modern. In October 1996, Modern filed a dischargeability complaint against Jeffrey.
 

 Over the next seven months, the parties entered into various settlement agreements, none of which were consummated. Finally, on March 13, 1997, Jeffrey agreed to pay Modern $21,000 within seven days, $1,000 of which was to cover Modern’s attorneys’ fees. In exchange, Modern agreed to release its lien on the mobile home and dismiss its complaints against Jeffrey. Jeffrey timely paid Modern the full settlement amount, and Modern released the lien and dismissed the lawsuits.
 

 To pay the settlement amount, Jeffrey gave his bankruptcy attorney a Bank of America cashier’s check made payable to Modern’s counsel. Jeffrey was designated as the purchaser on the face of the check. Unbeknownst to Modern, Cynthia had actually purchased the check from Bank of
 
 *1101
 
 America with her own funds. At the time of the purchase, Cynthia was insolvent.
 

 In June 1997, Cynthia filed her own chapter 7 petition. Cynthia’s Trustee subsequently filed a complaint against Modern to recover the proceeds of the cashier’s check alleging that the transfer was voidable, pursuant to § 548(a)(1), because Cynthia, not Jeffrey, made the payment to Modern, the payment took place less than one year prior to Cynthia’s bankruptcy filing, and Cynthia was insolvent at the time of the transfer. Modern moved to dismiss, or for summary judgment, on the ground that Cynthia did not transfer the funds to Modern and that Modern was a subsequent “good faith” transferee under § 550(b). The Trustee filed a cross-motion for summary judgment arguing that Modern was the “initial transferee” under § 550(a), and that Jeffrey was simply a “courier” of the funds.
 

 After a hearing on the motions, the bankruptcy court held that Modern was the “initial transferee,” and granted the Trustee’s Motion. Modern appealed to the Bankruptcy Appellate Panel (“BAP”), which reversed the bankruptcy court’s decision and remanded the case for a determination of whether Modern was a good faith subsequent transferee under § 550(b)(1).
 
 See Modem Fin. Plans & Servs. v. Abele (In re Cohen),
 
 236 B.R. 1, 7-8 (9th Cir.BAP 1999).
 

 On remand, the bankruptcy court determined that Modern had no duty of inquiry because the cashier’s check stated on its face that Jeffrey, the obligor, was the purchaser of the instrument. It therefore held § 550(b)(1) provided Modern with a safe harbor and granted judgment in its favor. The Trustee appealed to the United State District Court for the District of Arizona, which affirmed the BAP’s decision that Modern was not the initial transferee, and upheld the bankruptcy court’s holding that Modern had satisfied § 550(b)(1). Accordingly, the district court affirmed the bankruptcy court’s final order granting Modern’s motion for summary judgment.
 
 [1]
 
 This appeal followed.
 

 II
 

 In reviewing a district court’s affirmance of a bankruptcy court decision, we follow the same rule as the district court — findings of fact are reviewed under the “clearly erroneous” standard, and conclusions of law are reviewed de novo.
 
 In re Cal. Trade Technical Sch., Inc.,
 
 923 F.2d 641, 645 (9th Cir.1991).
 
 See also Onink v. Cardelucci (In re Cardelucci),
 
 285 F.3d 1231, 1233 (9th Cir.2002). Issues of statutory interpretation are also reviewed de novo.
 
 See In re Cardelucci,
 
 285 F.3d at 1233.
 

 A trustee may set aside a transfer of an interest of the debtor if the debtor made the transfer within one year of the date she filed a chapter 7 petition, and if she was insolvent at the time of the transfer.
 
 See
 
 11 U.S.C. § 548(a)(1) (1993). In this case, the parties do not dispute that a fraudulent transfer occurred within the meaning of the statute. If a transfer is voidable under § 548, the debtor’s trustee may recover from either: “(1) the initial
 
 *1102
 
 transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transfer.” 11 U.S.C. § 550(a)(1) & (2) (1993).
 

 A trustee’s right to recover differs dramatically depending on which section is applicable. Under the first section, •“[t]he trustee’s right to recover from an initial transferee is absolute.”
 
 Schafer v. Las Vegas Hilton Corp. (In re Video Depot),
 
 127 F.3d 1195, 1197-98 (9th Cir.1997) (citing 11 U.S.C. § 550(b)). Under the second section, the trustee may only recover if the subsequent transferee did not accept the transfer for value, in good faith, and without knowledge of the transfer’s voidability.
 
 Id.
 
 Thus, the “good faith” exception, or safe harbor, is only available to subsequent transferees.
 

 While the term transferee is not defined by the Bankruptcy Code, it is generally accepted that a transferee is one who, at a minimum, has “dominion over the money or other asset, the right to put the money to one’s own purposes.”
 
 Bonded Fin. Servs., Inc. v. European Am. Bank,
 
 838 F.2d 890, 893 (7th Cir.1988).
 
 See also In re Video Depot,
 
 127 F.3d at 1198 (same);
 
 In re Bullion Reserve of N. Am.,
 
 922 F.2d 544, 548 (9th Cir.1991) (same). In practical terms, the “dominion test” requires that a transferee be “free to invest the whole [amount] in lottery tickets or uranium stocks.”
 
 [2]
 

 Bonded Fin. Servs.,
 
 838 F.2d at 894. Dominion is therefore akin to legal control (e.g., the right to invest the funds as one chooses), not mere possession.
 
 See Bowers v. Atlanta Motor Speedway,
 
 99 F.3d 151, 156 (4th Cir.1996) (“[T]he dominion and control test as set forth in
 
 Bonded
 
 requires
 
 legal
 
 dominion and control over the funds transferred.”);
 
 In re Coutee,
 
 984 F.2d 138, 141 n. 4 (5th Cir.1993) (“Dominion or control means legal dominion or control.”).
 

 Based upon the above definitions, the Trustee contends that Modern was the “initial transferee.” We agree.
 

 A
 

 Case law discussing the rights of a re-mitter, or purchaser, of a cashier’s check is scant. The most closely analogous case in this Circuit, and that relied upon by the district court, the BAP, and Modern, to argue that Modern was not the initial transferee, is
 
 In re Video Depot.
 

 In
 
 Video Depot,
 
 Jeffrey Arlynn, the president of Video Depot and an active gambler, purchased a cashier’s check with Video Depot’s funds in order to pay off his gambling debt at Hilton in Las Vegas, Nevada. The check was made payable to Hilton and listed Video Depot as the purchaser on the face of the instrument. Arlynn delivered the cashier’s check (together with a personal check) to Hilton. Several months later, Video Depot filed for bankruptcy and the company’s trustee brought a fraudulent transfer claim against Hilton.
 

 
 *1103
 
 In determining whether Hilton was the initial transferee of the cashier’s check purchased by Video Depot, the bankruptcy court considered whether a corporate principal’s power to direct corporate resources constituted legal dominion or control. Holding in the negative, the bankruptcy court held that even though Arlynn controlled the business operations of Video Depot, once the check was issued he did not have legal control over the funds, even though he retained physical possession of the instrument. Because the cashier’s check was construed as a direct transfer from Video Depot to Hilton, “Arlynn ... did not have the right to use the money for any other purpose than to give it to Hilton.”
 
 Video Depot,
 
 127 F.3d at 1198.
 

 We affirmed, holding that Arlynn’s control over the business operations did not, by itself, indicate that he had dominion over the funds. Although we suggested that Arlynn may have established dominion over the funds by first directing a transfer into his personal bank account and then making a payment therefrom, directing the corporation to purchase the cashier’s check, placing the corporation’s name on the purchaser line, and making it payable to Hilton, did not entitle Arlynn to legal control.
 
 See id.
 
 at 1199. “Legal control over the funds consequently passed directly from Video Depot to Hilton.”
 
 Id.
 

 While this line of reasoning further supports the definition of dominion set forth in
 
 Bonded, Video Depot
 
 is not directly applicable to this case because the rights of the purchaser of the cashier’s check were not at issue. This distinction is critical.
 
 Video Depot
 
 did not consider whether the actual purchaser, or the purchaser listed on the cashier’s check (which happened to be the same entity) had control over the funds once the cashier’s check was issued. Thus, contrary to the district court, the BAP, and Modern’s conclusions,
 
 Video Depot
 
 does not stand for the proposition that a person listed as the purchaser on the face of a cashier’s check has legal control over the instrument. In fact, it stands for precisely the opposite— that a person who neither purchases the cashier’s check nor is listed as the purchaser has no right to enforce the instrument.
 

 Although
 
 Video Depot
 
 did not squarely address whether a remitter has the right to enforce a cashier’s check, this issue was thoughtfully addressed in
 
 Perrino v. Salem, Inc.,
 
 243 B.R. 550 (D.Me.1999). In that case, Mainly Payroll, Inc., (“MPI”) purchased a cashier’s check from Fleet Bank of Maine (“Fleet”) at the direction of the company’s president, Clifford Levesque. Levesque ordered Fleet to make the cashier’s check payable to Salem, an automobile dealership. In addition, Levesque directed Fleet to list Bond Brook Motors (“Bond Brook”) as the remitter on the face of the check. Fleet subsequently issued the check; MPI delivered it to Bond Brook; and Bond Brook delivered it to Salem in exchange for a Chevrolet Tahoe sport utility vehicle. Several months later, MPI filed for bankruptcy. Because MPI was insolvent at the time of the transaction, MPI’s trustee brought a fraudulent transfer claim against Salem pursuant to § 548(a)(1).
 

 Like the lower courts in this case, the bankruptcy court in
 
 Pemno
 
 concluded that Bond Brook’s designation as the re-mitter on the cashier’s check entitled Bond Brook to dominion over the funds and that Bond Brook was therefore the “initial transferee.”
 
 See Perrino,
 
 243 B.R. at 555-56. In reversing the bankruptcy court, however, the district court held that under the Maine Commercial Code the remitter of a cashier’s check is not entitled to enforce the instrument once it is issued to a third party. Thus, MPI, who was the true remitter, did not have the right to enforce
 
 *1104
 
 the instrument. Because MPI could only transfer to Bond Brook the rights it possessed, Bond Brook was similarly without enforcement rights.
 

 The court noted that while Bond Brook may have had the “right” to retain, destroy, or deliver the check to Salem, this “type of limited discretion with respect to transferred funds falls far short of the type of financial freedom discussed in
 
 [Bonded Fin. Servs., Inc. v. European Am. Bank,
 
 838 F.2d 890 (7th Cir.1988) ].”
 
 Id.
 
 at 561. Accordingly, Bond Brook’s name on the face of the check coupled with its physical possession for purposes of delivering the instrument to Salem did not entitle it to dominion over the funds. Bond Brook was, instead, a courier of MPI’s funds, and Salem was the “initial transferee.”
 
 See id.
 
 at 560-61.
 

 Thus, in assessing the rights of the parties,
 
 Pemno
 
 expressly relied upon the application of Maine’s Uniform Commercial Code (“U.C.C.”). The district court in this case, while acknowledging that
 
 Perrino’s
 
 analysis might in fact support the Trustee’s position, entirely discounted
 
 Perrino’s
 
 applicability because
 
 Perrino
 
 relied upon Maine state law, the Trustee failed to establish that the U.C.C. was applicable in this case, and the Trustee failed to support his argument with citations to the Arizona U.C.C.
 
 [3]
 

 Although we acknowledge the difficulty faced by the various federal judges who have wrestled with this issue, we think the district court’s reasons for disregarding
 
 Perrino
 
 and the Arizona U.C.C. are not sustainable.
 

 B
 

 It is well established that “[s]tate law ... determines the nature and extent of a debtor’s interest in property.”
 
 In re Richmond Produce Co.,
 
 151 B.R. 1012, 1016(Bankr.N.D.Cal.1993).
 
 See also Barnhill v. Johnson,
 
 503 U.S. 393, 397-98, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) (holding that a transfer is defined by federal law and, in the absence of federal law, property interests are “creatures of state law”). The property at issue both in
 
 Perrino
 
 and in this case is a negotiable instrument — a cashier’s check. Negotiable instruments are subject to the provisions of Article 3 of the U.C.C.
 
 See
 
 U.C.C. § 3-102 (1991). Both Arizona and Maine have adopted Article 3 of the U.C.C. and the states’ statutory provisions are virtually identical.
 
 See Barnhill,
 
 503 U.S. at 398 n. 5 (stating that all states have adopted the U.C.C. and there are no material differences between the versions adopted by each);
 
 Financial Mgmt. Servs., Inc. v. Familian Corp.,
 
 183 Ariz. 497, 905 P.2d 506, 511 (1995) (stating that Arizona adopted the 1990 revision of Article 3 of the U.C.C. in 1993) (citing 1993 Legis. Serv. 108 (West));
 
 Perrino,
 
 243 B.R. at 556 n. 1 (stating that Maine has adopted Article 3 of the U.C.C.). The parties’ interests in the cashier’s check are therefore subject to Arizona’s version of the U.C.C. just as the parties’ interests in
 
 Perrino
 
 were subject to the Maine Commercial Code.
 
 See
 
 A.R.S. § 47-1101,
 
 et seq.
 

 Turning to the relevant Arizona statutory provisions, we begin with Cynthia’s interests in the funds. Applying the U.C.C. provisions to the facts, Cynthia purchased a cashier’s check from Bank of America, payable to Modern, and listed
 
 *1105
 
 Jeffrey as the remitter on the face of the instrument. Jeffrey delivered the instrument to Modern, his creditor. When Cynthia purchased the cashier’s check from Bank of America, she therefore became the remitter of the instrument.
 
 [4]
 
 Bank of America’s transactional status was draw-ee,
 
 [5]
 
 drawer
 
 [6]
 
 and issuer
 
 [7]
 
 of the cashier’s check.
 
 [8]
 
 Once the check was issued, Cynthia took physical possession of it. Because the instrument was payable to Modern,
 
 [9]
 
 however, Modern had rights in the instrument whereas Cynthia was merely a “nonholder”
 
 [10]
 
 in possession.
 

 As the actual remitter of the cashier’s check, the issue is whether such status entitled Cynthia to enforce the instrument in her possession. The U.C.C. does not directly address this issue. The only indication of a remitter’s rights appears in the official commentary to U.C.C. § 3-312 which states in regard to lost, stolen or destroyed cashier’s checks that § 3-309 “applies only to a person entitled to enforce the cheek. It does not apply to a remitter of a cashier’s check ....” U.C.C. § 3-312 cmt. 1 (1991). This view, that a remitter of a cashier’s check may not enforce the instrument, is widely supported by legal commentators.
 
 See Perrino,
 
 243 B.R. at 557(listing scholars who have concluded that because the remitter is not the payee of a cashier’s check he or she is not entitled to enforce it).
 
 But cf.
 
 Gregory E. Maggs, DETERMINING THE RIGHTS AND LIABILITIES OF THE REMIT-TER OF A NEGOTIABLE INSTRUMENT: A THEORY APPLIED TO SOME UNSETTLED QUESTIONS, 36 B.C.L.Rev. 619, 640-645, 649 (1995) (suggesting that this official comment to Article 3 should be restricted to those who have lost, stolen or destroyed an instrument, allowing those who have rightful possession of the instrument to at least obtain a refund).
 

 The court in
 
 Perrino
 
 reasonably inferred that the commentary to § 3-1312 states that a remitter cannot enforce a cashier’s check because the remitter is not a party to the instrument unless it is a payee.
 
 See Perrino,
 
 243 B.R. at 557 n. 4. Because Cynthia was not the payee, only the Bank of America, as the drawer and drawee, and Modern, as the payee, were entitled to enforce the instrument.
 
 See id.
 

 Although the U.C.C. provides no explicit discussion of a remitter’s rights, it does discuss, in general, who is entitled to enforce a negotiable instrument. Arizona Revised Statute § 47-3301 states that a person may enforce an instrument if she is “the holder of the instrument, a nonholder in possession of the instrument who has the right of a holder, or a person not in possession of the instrument who is enti-
 
 *1106
 
 tied to enforce the instrument pursuant to § 47-3309 or § 47-3418, subsection D.” Although Cynthia initially had possession of the instrument, as discussed above, she was not a holder because the cashier’s check was payable to Modern.
 
 See id.,
 
 § 47-1201(20). As a nonholder, Cynthia was therefore only entitled to enforce the instrument if she acquired the rights of a holder by some other means (e.g., because the instrument was lost, stolen or destroyed, or due to payment or acceptance by mistake). There is no evidence that Cynthia acquired the rights of a holder by some other means. Accordingly, we hold that Cynthia was not entitled to enforce the instrument pursuant to § 47-3301.
 

 Having concluded that Cynthia did not have any legal interest in the cashier’s check, we consider Jeffrey’s interests. Jeffrey was named on the purchaser line of the instrument as the remitter. Pursuant to § 47-3103(11), however, Jeffrey was neither the person who purchased the instrument from the Bank of America, nor the person to whom the Bank of America issued the check.
 
 See Perrino,
 
 243 B.R. at 559. Thus, as a matter of law, Jeffrey was not the remitter of the cashier’s check.
 
 See In re Spears Carpet Mills, Inc.,
 
 86 B.R. 985, 993 (Bankr.W.D.Ark.1987) (“[Fjilling in of the remitter line on a cashier’s check is akin to the filling in of the memo line on a personal check; helpful, but not required, and of no legal effect.”); Maggs, DETERMINING THE RIGHTS AND LIABILITIES OF THE REMITTER OF A NEGOTIABLE INSTRUMENT, 36 B.C. L.Rev. at 624 (stating that “[although cashier’s checks and teller’s checks generally contain a space to indicate the remitter’s name, the purchaser does not need to fill in the name”). Even if Jeffrey were considered a remitter because his name appears on the face of the instrument, as discussed above, such status would not give him the right to enforce the cashier’s check, unless he became a holder.
 
 See
 
 A.R.S. § 47-3301.
 

 We next examine whether Jeffrey’s possession of the cashier’s check entitled him to dominion over the funds. It is undisputed that Jeffrey obtained possession of the instrument legally — Cynthia delivered
 
 [11]
 
 the cashier’s check to Jeffrey. The delivery, however, did not constitute a negotiation
 
 [12]
 
 of the cashier’s check because Jeffrey was not a payee of the instrument. Thus, Jeffrey did not become a holder of the check upon delivery.
 
 [13]
 
 Because Jeffrey was not a holder of the instrument, he was not entitled to enforce it under § 47-3201.
 

 Whether or not there was a negotiation, a party may still transfer an instrument to another party if the instrument is delivered by a person other than the issuer for the purpose of giving the person accepting delivery the right to enforce the instrument.
 
 See
 
 A.R.S. § 47-3203(A)
 
 &
 
 (B). We assume for the sake of argument that Cynthia delivered the cashier’s check to Jeffrey with the intention of giving him the right to enforce the instrument. Nevertheless, Jeffrey could only inherit from Cynthia the rights she possessed.
 
 See id.,
 
 § 47-3203(B) (“Transfer of an instrument ... vests in the transferee any right of the transferor to enforce the instrument.”).
 
 *1107
 
 Since Cynthia was not a holder and had no right to enforce the instrument, Jeffrey could not have acquired such rights from her. Thus, as a matter of law, Jeffrey, like Cynthia, was not entitled to enforce the cashier’s check under § 47-3301.
 

 In sum, the only control that Jeffrey could exercise over the funds, like Bond Brook, was to retain, destroy, or deliver the instrument to Modern. This type of control falls short of that required to satisfy the “dominion test.” Jeffrey, like Bond Brook, was therefore simply the courier of an instrument that was transferred to the payee.
 

 The final party to the transaction in this case was Modern. After Jeffrey acquired possession of the cashier’s check, he had the check delivered to Modern. That delivery qualified as both a negotiation and a transfer because Modern was the payee of the instrument and thus became the holder.
 
 See
 
 A.R.S. §§ 47-3201, 47-3203. As the holder of the instrument, Modern was entitled to enforce the cashier’s cheek.
 
 See id.,
 
 §§ 47-1201(20), 47-3301. Consequently, Modern was the first entity to exercise dominion over the instrument.
 

 Ill
 

 We therefore hold, pursuant to § 550(a)(1), that Modern was the “initial transferee” and that Modern is strictly liable to the Trustee under §§ 548 and 550. While mindful of Modern’s policy concerns that a ruling in the Trustee’s favor, under either § 550(a) & (b), may “throw into question an overwhelming number of settlements reached in this country ... due to the unknown possibility that the source of the settlement funds was a bankrupt debtor inside ... the voidability period,” it is Congress’ prerogative to calibrate the liabilities of the parties under § 550 and we are bound by its judgment.
 
 See Rupp v. Markgraf,
 
 95 F.3d 936, 944 (10th Cir.1996) (“Congress has already balanced the equitable considerations under § 550 by distinguishing between initial transferees, who are strictly liable, and subsequent transferees, who are not strictly liable.”).
 

 Accordingly, we reverse the district court’s judgment affirming the bankruptcy court’s order granting summary judgment in favor of Modern and remand to the district court with instructions to remand to the bankruptcy court to enter judgment in favor of the Trustee. Because we conclude that Modern was the initial transferee, we do not reach Modern’s § 550(b) argument. The parties shall bear then-own costs on appeal.
 

 REVERSED and REMANDED with instructions.
 

 [1]
 

 . Modern argued in the district court that its status as an initial transferee was not properly before that court because the BAP decision was a final order and was only appealable to this Court. The district court rejected this argument, holding that the BAP decision was not a final order and therefore not appeal-able. While this issue is not raised on appeal, we nevertheless affirm the district court's holding based upon our own review of the four-factor finality test set forth in
 
 Neary v. Padilla (In re Padilla),
 
 222 F.3d 1184, 1188 (9th Cir.2000). Both the bankruptcy court order, which was appealed to the district court, and the district court’s judgment were final appealable orders, and thus we have jurisdiction over the present appeal.
 
 See In re Padilla,
 
 222 F.3d at 1188.
 

 [2]
 

 . Contrary to the BAP, the district court, and Modern's contentions, we have not explicitly adopted the "control test” set forth in
 
 Nordberg v. Societe Generala (In re Chase & Sanborn Corp.),
 
 848 F.2d 1196, 1199 (11th Cir.1988).
 
 See In re Cohen,
 
 236 B.R. at 5. The “control test” advises that courts "step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable.”
 
 In re Chase & Sanborn Corp.,
 
 848 F.2d at 1199. In the case of
 
 In re Bullion Reserve of N. Am.,
 
 we discussed both the "dominion test” set forth in
 
 Bonded
 
 and the "control test” set forth in
 
 Chase & Sanborn
 
 and selected the more restrictive "dominion test.” 922 F.2d at 548-49. In
 
 Video Depot,
 
 while the terms dominion and control were used interchangeably, we relied entirely upon
 
 Bonded’s
 
 definition of "transferee.” 127 F.3d at 1198. In this case, we again rely exclusively upon the "dominion test” propounded in
 
 Bonded.
 

 [3]
 

 . Modern also contends that
 
 Perrino
 
 should be disregarded because it is not binding authority and because the district court failed to apply the "control test” in its analysis. Although
 
 Perrino
 
 is not binding authority, we may consider its legal and statutory analysis. Moreover,
 
 Perrino’s
 
 application of the "dominion test” is consistent with our jurisprudence, as discussed in note 2,
 
 supra.
 

 [4]
 

 .
 
 See
 
 A.R.S. § 47-3103(11) (1997) (" 'Remit-ter' means a person who purchases an instrument from its issuer if the instrument is payable to an identified person other than the purchaser.'').
 

 [5]
 

 .
 
 See id.,
 
 § 47-3103(2)(A "drawee” is "a person ordered in a draft to make payment.”).
 

 [6]
 

 .
 
 See id.,
 
 § 47-3103(3)(A "drawer” is "a person who signs or is identified in a draft as a person ordering payment.”).
 

 [7]
 

 .
 
 See id.,
 
 § 47-3105(C)(" 'Issuer' applies to issued and unissued instruments and means a maker or drawer of an instrument.”).
 

 [8]
 

 .
 
 See id.,
 
 § 47-3104(G)(A "cashier's check” is “a draft with respect to which the drawer and drawee are the same bank or branches of the same bank.”).
 

 [9]
 

 .
 
 See id.,
 
 § 47-3109(B)(2)("A promise or order that is not payable to bearer is payable to order if it is payable ... [t]o an identified person or order.").
 

 [10]
 

 .
 
 See id.,
 
 § 47-1201(20) (" 'Holder' with respect to a ... negotiable instrument means the person in possession if the instrument is payable to bearer or, in the case of an instrument payable to an identified person, if the identified person is in possession.”).
 

 [11]
 

 .
 
 See id..,
 
 § 47-1201(14)(delivery means "voluntary transfer of possession”).
 

 [12]
 

 . See
 
 id.,
 
 § 47-3201(A "negotiation” is “a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder.”).
 

 [13]
 

 .As with Cynthia, this conclusion properly draws a line between ownership rights as defined by state law and enforcement rights as defined by the U.C.C.
 
 See
 
 U.C.C. § 3-203 cmt. 1 (1991).