In re FOX BEAN CO., INC., Debtor.

R. Sam Hopkins, Trustee, Plaintiff,

v.

D.L. Evans Bank, an Idaho corporation, Defendant.

Bankruptcy No. 00–40881.
Adversary No. 01–6187.

United States Bankruptcy Court,
D. Idaho.

Dec. 26, 2002.

James A. Spinner, Monte Gray, Service, Gasser & Kerl, Pocatello, ID, for Plaintiff.

R.C. Stone, Parsons, Smith & Stone, Burley, ID, for Defendant.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

## I. Introduction.

Fox Bean Company Inc. (hereinafter "Debtor") filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on June 1, 2000. On August 1, 2001, the Chapter 7 Trustee R. Sam Hopkins (hereinafter "Plaintiff") commenced this adversary proceeding to recover two transfers of funds made to D.L. Evans Bank (hereinafter "Defendant"). On April 26, 2002, this Court denied Plaintiff's Motion for Summary judgment. Docket Nos. 44 and 45. A trial on the merits was then conducted before the Court on October 10 and 11, 2002, during which both parties offered testimony and other evidence. In addition, the parties filed a written stipulation as to many of the significant facts. Docket No. 52. At the conclusion of the trial, the Court took the issues under advisement. After considering the record, the arguments of the parties, and the law, the Court intends this decision to constitute its findings of fact and conclusion of law in accordance with Fed. R. Bankr.P. 7052.

## II. Facts.

From the record, most relevant facts appear largely undisputed. With respect to those issues of fact that remain, the Court has had the opportunity to observe the testimony of the various witnesses, and has given due consideration to those witnesses, and has assigned appropriate weight to all the evidence. As a result of this process, the following appear to be the material facts.

Kelly Fox was engaged in the business of buying, selling, and trading dried pulses, including beans, rice, peas, lentils, and other similar agricultural products in Twin Falls, Idaho. Mr. Fox originally conducted his business as a sole proprietorship under the trade name "Fox Bean Company." In 1998, Mr. Fox filed the appropriate certificate of assumed business name with the Idaho Secretary of State, giving notice of his adoption of his trade name. Defendant's Ex. A.

Mr. Fox opened a checking account with Defendant's local branch to facilitate his business operations. The checking account (hereinafter "Fox account") was opened in September, 1997, in the names of Kelly Fox and his wife, Patricia Fox, doing business as Fox Bean Company. Plaintiff's Ex. 15. In addition, Mr. Fox's tax identification number was supplied to

Defendant for use in connection with this account. Stipulated Facts, ¶ 2, Docket No. 52.

Mr. Fox also established a line of credit with Defendant in 1997 in order to fund the operations of Fox Bean Company. Stipulated Facts, ¶ 4, Docket No. 52. This line of credit, memorialized by a promissory note (hereinafter "the Fox note"), was secured by warehouse receipts generated in the business and a deed of trust covering certain nonbusiness real estate owned by the Foxes. Plaintiff's Ex. 19. Mr. Fox negotiated several extensions on the Fox note, eventually agreeing to a maturity date of March 5, 2000. Defendant's Exs. L through P.

In 1998, Mr. Fox incorporated Fox Bean Company, Inc., the Debtor in this matter. Plaintiff's Ex. 4. That same year, Debtor, acting through Mr. Fox, arranged its own revolving line of credit with Defendant. Plaintiff's Ex. 6. This line of credit, also memorialized by a promissory note (hereinafter "the Debtor's note"), was secured by Debtor's business inventory, accounts, and general intangibles. Plaintiff's Ex. 6. Both Mr. and Mrs. Fox personally guaranteed the note, Defendant's Exs. T and U, and executed two deeds of trust on real property they owned personally in order to provide additional collateral. Defendant's Exs. W and Y. As with the Fox note, Debtor, through Mr. Fox, negotiated several extensions on the Debtor's note, the effect of which was to postpone the maturity date until January 15, 2001. Plaintiff's Exs. 7 through 9.

Despite Defendant's suggestions that Mr. Fox simultaneously operated his sole proprietorship and the Debtor-corporation, based upon the evidence and testimony, the Court is persuaded and finds that Mr. Fox intended all of his business operations previously conducted as a sole proprietorship to be taken over and subsumed into the operations of the Debtor-corporation after it was organized. In other words, the Court is convinced that after Debtor was incorporated, Debtor was the only business operation that Mr. Fox maintained. Admittedly, there is evidence in the record that even after Debtor was incorporated, Mr. Fox accepted checks for business receivables made payable to both "Fox Bean Company" and "Fox Bean Company, Inc.," and that the certificate of assumed business name for "Fox Bean Company" remained effective long after the corporation was created. However, the Court attributes this to the fact that Mr. Fox's primary concern and expertise was in trading dried pulses, and not in the intricacies of business management. Consistent with this reality, it appears Mr. Fox never established a corporate bank account for use in Debtor's business operations, but instead continued to use the Fox account as the business account for Debtor, even through the date of the bankruptcy filing. Plaintiff's Ex. 24. The record is clear that while Debtor was in all respects a valid corporation, and a separate legal entity, Mr. and Mrs. Fox, as the officers of Debtor, intentionally conducted all of Debtor's banking activity through the Fox account.

For a time, Debtor's business grew rapidly. Debtor reported $1,174,234.00 in sales for tax purposes in 1999. Plaintiff's Ex. 11. One of Debtor's customer accounts that contributed to this high sales volume was with a company called Intergranos, a business located in Mexico. Debtor apparently sold a large amount of goods to Intergranos on credit, but at some time after the sale, Intergranos expressed a reluctance to pay for those goods. Debtor pursued legal remedies, and Mr. Fox believed as of the end of 1999 that recovery on this account receivable was still likely. This belief was expressed in Debtor's 1999 year-end financial state-

ment, which included the Intergranos sales in its assets as an account receivable, albeit with an appropriate notation concerning the possible problems with collection of the account. Defendant's Ex. BB.

Shortly after the issuance of this financial statement, additional facts became known to Mr. Fox regarding the Intergranos account. When the certified public accountant who prepared the financial statement learned these new, discouraging facts about the dim prospects for collection from Intergranos, he was prompted to revise the financial statement to exclude the Intergranos account from the other collectible accounts receivable. Plaintiff's Ex. 13. Because of the size of the Intergranos account, Debtor's revised financial statement, prepared February 2, 2000, shows Debtor's liabilities exceeding its assets by $392,115.00, whereas the original financial statement showed a positive stockholder equity of $17,576.00. Plaintiff's Ex. 13 and Defendant's Ex. BB.

Beyond the financial statements, Debtor's tax returns also document the weakening of Debtor's financial position over time. The Schedule L balance sheet in Debtor's 1999 tax return listed liabilities in excess of assets by $32,720.00 as of the beginning of the year. By year's end, liabilities exceeded assets by $393,114.00. Plaintiff's Ex. 11. The 2000 tax return shows that between January 1, 2000, and June 1, 2000, the date Debtor filed for bankruptcy and terminated business operations, the deficit of liabilities over assets had ballooned to $730,631.00. Plaintiff's Ex. 12.

Two transfers are targeted by Plaintiff in this avoidance action. The first occurred on March 14, 2000. Prior to this date, Mr. Fox had sold real property that he owned personally and deposited the proceeds into the Fox account, commingling these proceeds with other deposits of the corporate accounts receivable. Some time after making the deposit, Mr. Fox authorized Defendant to apply $28,908.82 from the Fox account to pay off the balance due on the Fox note. Defendant did so and released its interest in the collateral securing that note.

Plaintiff also seeks to recover a transfer that occurred on May 24, 2000, about a week prior to Debtor's bankruptcy filing, effected by Defendant via an involuntary offset from the Fox account. During the months and days preceding the offset, Mr. Fox had communicated frequently with the loan officer at the bank who had for several years supervised Debtor's loan accounts about the status of the Intergranos account and Debtor's financial health. According to that loan officer, Mr. Newberry, at the bank's request, Mr. Fox provided Mr. Newberry an updated version of Debtor's financial statement on May 24, 2000. Mr. Newberry noticed that, for the first time, this financial statement listed the Intergranos account under bad debts rather than as a collectible account receivable. The loan officer testified that the information in this updated financial statement led him to conclude that Debtor would be unable to repay Debtor's note. Therefore, Mr. Newberry immediately, and without notice to Mr. Fox, ordered a setoff of $56,500.00 from funds in the Fox account and applied those funds to the outstanding balance on Debtor's note. This offset depleted the Fox account and left Debtor unable to operate.

Debtor filed for bankruptcy relief eight days later on June 1, 2000.

### III. Discussion and Disposition of the Issues.

Plaintiff challenges the March 14 transfer to Defendant and the May 24 offset based on different legal theories. According to Plaintiff, the March 14 transfer is avoidable under 11 U.S.C. § 548(a) as a

constructively fraudulent conveyance. Plaintiff asserts the offset conducted by Defendant on May 24 is recoverable under 11 U.S.C. § 553(b). Plaintiff alleges he is entitled to judgment against the Defendant for both transfers pursuant to 11 U.S.C. § 550(a). The Court will address the issues regarding each transfer separately.

### A. The March 14 transfer.

The Bankruptcy Code instructs that:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property ... that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation

. . . .

11 U.S.C. § 548(a)(1). Plaintiff, as trustee, argues that because the Debtor-corporation's funds were used to pay off Mr. Fox's personal indebtedness within one year of the bankruptcy, and while Debtor was insolvent, the transfer to Defendant can be avoided as a fraudulent conveyance.

■ Defendant insists the March 14 transfer is not avoidable under § 548 because there was no transfer of Debtor's property involved. To support its view, Defendant points to the fact that funds transferred to the bank in payment of the Fox note came from the Fox account, an account "owned" by Mr. and Mrs. Fox personally, rather than from any corporate account.

To buttress its position, Defendant relies upon several Idaho statutes, including provisions of Idaho's Uniform Commercial Code ("UCC"), Uniform Fiduciaries Law ("UFL"), and the Idaho Bank Act, all of which Defendant argues establish that Debtor had no legal interest in funds in the Fox account. *See* Idaho Code § 28–1–101 *et seq.;* Idaho Code § 68–301 *et seq.;* Idaho Code § 26–101 *et seq.* In particular, Defendant cites Idaho Code § 28–4–401[1] for the proposition that a bank must honor directions given by the customer who owns an account pursuant to the account agreement. Defendant also points to Idaho Code § 68–309,[2] which provides in part

---

**1.** Idaho Code 28–4–401(1) states in relevant part:

A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank.

**2.** Idaho Code § 68–309 states in relevant part:

If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary or of the checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and indorsed by him, if he is empowered to indorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary *is committing thereby a breach of his obligations as fiduciary;* and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.

that a bank is not liable to a principal if the bank accepts checks made payable to the principal for deposit into the personal account of a fiduciary, so long as the bank has no knowledge that the fiduciary is breaching his duty and the bank does not act in bad faith. Finally, Defendant cites Idaho Code § 26–717,[3] which details the procedure that someone other than the owner of a bank account must follow in order for the bank to recognize that person's interest in an account. Defendant argues that when taken together, these statutes dictate that only the owner of a bank account may assert a legally cognizable interest in a deposit account. Defendant suggests that if the Court holds that Debtor had an interest in the Fox account funds in spite of these statutes, that great disruption will be visited upon bank management practices.

The Court is not persuaded these statutes support Defendant's position, at least not in the context of a trustee's pursuit of a debtor-principal's funds which are deposited in an agent's bank account during the

course of a federal bankruptcy proceeding. While these statutes may define the rights of the account owner and third parties as against the depository bank, in the environment of a bankruptcy case, these state statutes do not necessarily resolve the rights of the account owner in relation to the bankruptcy-debtor, the true owner of the funds deposited in that account.[4]

More precisely, Idaho Code § 28–4–401 and § 68–309 address a bank's obligation to its customer and a bank's obligation to a third party, respectively, in ordinary circumstances. The statutes impose a duty upon the bank to deposit funds presented by the account owner without question, and supply the bank with a shield against the claims of others to those deposited funds. However, neither statute addresses the relationship under examination in this action: whether a debtor corporation retains an interest in its funds when they are deposited by the corporation's agent into the agent's personal bank account.

Upon close examination, Idaho Code § 26–717, contrary to Defendant's asser-

---

**3.** Idaho Code § 26–717 states in relevant part:

Notice to any bank of an adverse claim to a deposit standing on its books to the credit of any person shall not require the bank to recognize the adverse claim unless the adverse claimant shall: (a) procure a restraining order, injunction or other appropriate process against the bank from a court of competent jurisdiction wherein the person to whose credit the deposit stands is made a party and served with summons, or (b) execute to said bank, in a form and with sureties acceptable to the bank, a bond indemnifying the bank from any and all liability, loss, damage, costs and expenses for and on account of the payment of such adverse claim or the dishonor of the check or other order of the person to whose credit the deposit stands on the books of the bank. This section shall not apply in any instance where the person to whose credit the deposit stands is a fiduciary for such adverse claimant, and the facts constituting such

relationship and the facts showing reasonable cause for belief on the part of the claimant that the fiduciary is about to misappropriate the deposit, are made to appear by the affidavit of the claimant.

**4.** In resolving the complicated issue presented here, it is critical to precisely identify the nature of the problem faced by the Court. See Arthur L. Corbin, *Legal Analysis and Terminology*, 29 Yale L.J. 163, 163 (1919–1920). As pointed out by Professor Corbin, a "legal interest" is the aggregate of the legal relations of a person with respect to a specific physical object or the physical relations of specific objects. *Id.* at 173. Similarly, he explains that the term "legal relation" should always be used with reference to two persons, neither more nor less. *Id.* at 165. Accordingly, whether Debtor had an interest in the Fox account is an issue that must be resolved by looking at the legal relation between Debtor and Mr. Fox, and not that between Debtor and Defendant or between Mr. Fox and Defendant.

tions, seems to at least impliedly support the notion that Debtor could retain an interest in its funds when deposited in the Fox account because that statute establishes a legal mechanism for third parties to assert their rights in funds deposited into an account not owned by them as against the bank. Similarly, Idaho Code § 68–309 suggests that a third party, like Debtor, has a continuing interest in funds deposited into a fiduciary's personal account, like the Fox account. The statute merely limits the instances when a bank will be liable to the principal for those funds.

More to the point, there is a significant line of bankruptcy cases analyzing the relationship between a third party and a deposit account owner *without referring to the UCC, UFL, or other banking statutes.* *See Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177, 1181–82 (11th Cir.1987) (looking at factors other than mere location of funds in a debtor's bank account in determining if funds in the account were property of the bankruptcy estate); *Dayton Title Agency, Inc. v. White Family Cos., Inc. (In re Dayton Title Agency, Inc.),* 262 B.R. 719, 729–30 (Bankr.S.D.Ohio 2001) (identifying a debtor's interest in funds in the debtor's bank account by looking at control over the funds and depletion of estate assets). Plaintiff and Defendant both cite *Chase & Sanborn* to support their positions. *Chase & Sanborn,* and the line of cases relying on it, focuses on an issue similar, but not identical, to the one before the Court here:

whether funds owned by a third party which are deposited into a debtor's bank account become property of the debtor's bankruptcy estate.[5] *See id.* at 1178–79. These cases adopt the notion that funds do not belong to a debtor, even when deposited in the debtor's account, if the debtor was a mere conduit for channeling another's funds. *Id.* Refinements in the *Chase & Sanborn* approach have led the courts to adopt a two part test to determine whether third party funds belong to a debtor: (1) does the debtor have control over the funds; and (2) did the transfer diminish the debtor's estate? *Dayton Title,* 262 B.R. at 729–30. Were Mr. Fox the debtor here, the *Chase & Sanborn* cases would instruct that the March 14 transfer did not involve a transfer of his interest in property because there was no diminution in Mr. Fox's property. Rather, those cases would recognize, regardless that debtor was the technical "owner" of the account, that the third-party's funds did not become property of the debtor's bankruptcy estate.

Admittedly, the cases discussed above are factually distinguishable from the case at bar because *Chase & Sanborn* and its progeny deal with the status of third party funds in a debtor's account as property of the bankruptcy estate, rather than examining the relative interests of debtor's funds when deposited in a third party account. Still, the logic of these cases is persuasive and they tacitly support the conclusion that here Debtor retained an interest in the funds deposited in the Fox account. On this record, the Court finds that the

**5.** *See also Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.),* 216 B.R. 371, 377 (Bankr. S.D.N.Y.1998) (holding a debtor's corporate control over a subsidiary did not give debtor a recoverable interest in funds paid out by subsidiary); *Carmel v. River Bank Am. (In re FBN Food Servs., Inc.),* 185 B.R. 265, 273 (N.D.Ill. 1995) (finding that the debtor had an undeni-

ably strong nexus to the funds transferred and stating "the fact that [debtor] did not actually cut the check that [the creditor] deposited into its own account does not undermine the bankruptcy court's conclusion that the debtor actually had an interest in the property"), *aff'd in part, In re FBN Food Servs., Inc.,* 82 F.3d 1387 (7th Cir.1996).

Fox account was used by Mr. and Mrs. Fox as a mere conduit for channeling Debtor's money to its creditors. While on deposit, the Debtor-corporation, acting through Mr. Fox, exercised control over the funds in the Fox account. Completing the analysis, when the transfer of funds occurred from the Fox account to Defendant on March 14, Debtor's assets were thereby diminished. Under the *Chase & Sanborn* approach, the March 14 transfer involved property of the Debtor.

■ Using an alternative analysis yields the same result as to whether the March 14 payment involved a transfer of "an interest of the debtor in property." 11 U.S.C. § 548(a)(1). The Bankruptcy Code does not define the phrase "interest of the debtor in property." However, this identical language has been interpreted by the United States Supreme Court to include any "property that would have been part of the [bankruptcy] estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. I.R.S.*, 496 U.S. 53, 58–59, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (interpreting the same language in the preference provisions of the Code, 11 U.S.C. § 547(b)). *See also, Taylor Associates v. Diamant (In re Advent Mgmt. Corp.)*, 104 F.3d 293, 295 (9th Cir.1997) (applying this definition in a fraudulent conveyance action brought pursuant to 11 U.S.C. § 548(a)). As provided in 11 U.S.C. § 541, "property of the bankruptcy estate" is an extremely expansive concept, and Congress intended the estate to encompass, *inter alia*, "all legal or equitable interests of the debtor in property as of the commencement of the case," subject to a few narrow exceptions not relevant in this matter. 11 U.S.C. § 541(a)(1). Whether a debtor holds a legal or equitable interest in particular property, absent any controlling federal authority, is a question of state law. *Han-*

*sen v. MacDonald Meat Co. (In re Kemp Pacific Fisheries, Inc.)*, 16 F.3d 313, 315–16 (9th Cir.1994).

■ In Idaho, corporate officers and directors, such as Mr. Fox, are the agents of the corporation. *Jordan v. Hunter*, 124 Idaho 899, 865 P.2d 990, 995–96 (1993). As agents, corporate officers and directors are subject to the general principles of agency law, including the fiduciary duties of agents. *Id.* Because of the existence of an agency, an officer or director is a fiduciary for the corporation, and as an agent, the officer or director holds a principal's property for the benefit of the principal. *Stephan v. Hoops Constr. Co.*, 115 Idaho 894, 771 P.2d 912 (1989) (quoting from *Kidwell ex rel. Penfold v. Meikle*, 597 F.2d 1273, 1292 (9th Cir.1979), that "corporate directors are fiduciaries, and may not appropriate corporate assets or opportunities for their own gain"); *State v. Compton*, 92 Idaho 739, 450 P.2d 79, 81 (1969) (acknowledging one who collects a debt on behalf of another is an agent of that other person for purposes of an embezzlement statute which applied to an "agent"). *See also,* Restatement (Second) of Agency § 427 (1958) ("an agent who has received goods or money for the principal has a duty to use care to keep them safely until they are remitted or delivered to the principal").

■ By holding a principal's property, the agent does not divest the principal of its interests in the property. This proposition is illustrated by a line of Idaho cases in which principals have successfully asserted claims for conversion as the appropriate mechanism for protecting the principal's interest in property as against agents who misuse that property. *See, e.g., Property Mgmt. West, Inc. v. Hunt*, 126 Idaho 897, 894 P.2d 130, 132 (1995) (noting the trial court found against a corporate director on a conversion claim when the director paid herself more than she should

have under a profit sharing plan); *Weatherhead v. Troll–Master, Inc.*, 123 Idaho 697, 851 P.2d 993, 998 (1992) (finding sufficient evidence to uphold a conversion claim when the record showed directors made corporate payments to themselves without proper approval). Given the theme of the Idaho case law, it seems clear that a corporation retains at least an equitable interest in any corporate property held on its behalf by its officer or director.

In this case, the evidence proves that the funds deposited in the Fox account were Debtor's corporate receivables and that in making those deposits, Mr. Fox was acting as an agent of Debtor. By contrast, there is no evidence that in depositing corporate funds in the Fox account, the Debtor-corporation intended to transfer ownership of those funds to Mr. and Mrs. Fox personally.

Moreover, it is equally clear from the proof that the March 14 transfer of funds from the Fox account to Defendant involved a transfer of Debtor's property. Specifically, Debtor's bookkeeper testified that the Fox account was used exclusively as the operating account for Debtor. The bookkeeper further testified that as of January 21, 2000, the Fox account was overdrawn. Through the bookkeeper's testimony, and by reference to the Fox account bank statements, Plaintiff convincingly established that all funds deposited into the Fox account by Mr. Fox or others between January 21 and March 14, 2000, came from checks payable to the Debtor-corporation, as opposed to checks payable to Mr. Fox personally or to Fox Bean Company. Plaintiff's Ex. 3.[6] The methodical approach taken by Plaintiff's counsel in

tracing the funds in the Fox account back to Debtor allows the Court to confidently conclude that any money in the Fox account as of March 14 originated with the Debtor.

It is also clear from the record that Mr. Fox was acting as an agent of Debtor when he collected checks payable to Debtor, endorsed those checks, and deposited them into the Fox account. Debtor's articles of incorporation gave Mr. Fox the authority to manage Debtor's business affairs, and the minutes from the first meeting of the board of directors note that a resolution was adopted expressly giving Mr. Fox the power to "endorse and receive payments" for Debtor. Plaintiff's Exs. 4 and 24. Mr. Fox testified that, during 1999 and 2000, he regularly collected checks made out to both "Fox Bean Company" and "Fox Bean Company, Inc." on behalf of Debtor and deposited the funds into the Fox account. The fact that Mr. Fox was acting as an agent in handling Debtor's money, including funds deposited into the Fox account, is further evidenced by the fact that Mr. Fox listed the Fox account as one of Debtor's assets in Debtor's financial statements and in Debtor's bankruptcy schedules. Plaintiff's Exs. 13 and 21.

Given this proof, the Court is convinced that Mr. Fox was acting as Debtor's agent when he collected and deposited corporate funds in the Fox account. Accordingly, Debtor retained an interest in the Fox account funds that would be recognized by state law. *Property Mgmt. West*, 894 P.2d at 132. So, too, the Court concludes that had Mr. Fox not authorized the transfer of the funds in the Fox account to Defendant

---

6. Again, while the Court finds that the checks deposited were payable to the corporation, the result would be no different even had those checks been payable to Mr. Fox or his trade name. The checks were clearly payable for transactions engaged in by the corporation, and as the Court found above, Mr. Fox conducted no trading transaction in either his personal capacity or as a sole proprietorship after Debtor was established.

on March 14, those funds would have become property of Debtor's bankruptcy estate, recoverable by Plaintiff as trustee, as a matter of federal law. *See* 11 U.S.C. § 542(a)(1) ("an entity ... in possession, custody, or control, during the [bankruptcy] case, of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property ...."); *Taylor Associates,* 104 F.3d at 295.

Regardless of the approach used to analyze the substance of the March 14 transaction, for purposes of this action, the Court concludes that Debtor had a sufficient interest in the Fox account such that the March 14 payment involved a transfer of "property of the debtor" so as to satisfy that requirement of § 548(a)(1). *Begier,* 496 U.S. at 58–59, 110 S.Ct 2258; *Taylor Associates,* 104 F.3d at 295.

The Court next must examine whether the other requisites for an avoidable fraudulent conveyance have been established in this case. The Court must first examine whether the transfer of funds on March 14 was a "transfer" for purposes of § 548(a)(1). 11 U.S.C. § 101(54) defines "transfer" to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property...." *See also Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen),* 300 F.3d 1097, 1101–02 (9th Cir.2002) (noting neither party disputed that a fraudulent transfer took place when debtor's money was used to pay the debt of another); *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.),* 127 F.3d 1195, 1197 (9th Cir.1997) (noting that both parties stipulated a fraudulent transfer took place when corporate funds were used to pay the debt of a principal). Under the facts of this case, where the Debtor's funds were used by Defendant to pay the debt of another, it is clear a transfer occurred for purposes of § 548.

It is undisputed that the March 14 transfer occurred within one year before Debtor's June bankruptcy filing. Plaintiff's Ex. 21. That element of § 548(a)(1) is also satisfied.

■ Whether, for purposes of the fraudulent conveyance statute, Debtor received a reasonably equivalent value for the March 14 transfer is to be analyzed from the position of a creditor. *Roosevelt v. Ray (In re Roosevelt),* 176 B.R. 200, 206 (9th Cir. BAP 1994). The purpose of this element of a fraudulent conveyance claim is to allow the trustee to avoid only those transfers that result in a diminution of a debtor's prepetition assets. *Id.* at 208. Beyond looking at what is exchanged in a *quid pro quo* transaction, it is important to examine the value of all benefits inuring to a debtor by virtue of the transaction in question, directly or indirectly. *See Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.),* 267 B.R. 602, 612–13 (8th Cir. BAP 2001). However, a debtor's payment of the debt of another does not constitute a reasonably equivalent value when the debtor is not obligated on the debt. *Id.* at 612–13; *Wood v. Delury, Pomares & Co. (In re Fair Oaks, Ltd.),* 168 B.R. 397, 402 (9th Cir. BAP 1994).

■ In this case, the Court finds Debtor received nothing of value in exchange for the March 14 transfer of funds that paid off the Fox note to Defendant. Viewed simply, Debtor's funds were used to pay off the debt of another entity. *Wood,* 168 B.R. at 402. Further, testimony from the loan officer supervising collection of both the Fox note and Debtor's loan, and a review of the loan documents, confirm Debtor was not legally obligated to pay the loan, nor were any corporate assets used to secure the Fox note. In

other words, when the Fox note was paid, Debtor received no benefit by having liens on corporate assets satisfied. Nothing in the record indicates that Debtor benefitted in any way, directly or indirectly, from the transfer. The Court concludes that Debtor received less than a reasonably equivalent value in exchange for such transfer. 11 U.S.C. § 548(a)(1)(B)(i).

■■■ Finally, the Court must determine if Debtor was insolvent or became so as a result of the transfer on March 14. Insolvency is, for bankruptcy purposes, a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation ...." 11 U.S.C. § 101(32). The record in this case contains substantial evidence concerning Debtor's financial condition at this difficult time in its history.

First, the Schedule L in Debtor's 1999 tax return reflects that as of the last day of 1999, Debtor's liabilities exceeded its assets by $393,114.00, so that as of that date, Debtor was insolvent. Plaintiff's Ex. 11.

Another important indicator of Debtor's financial condition is the revised financial statement issued by Debtor's accountant in February, 2000. This financial statement, also intended to reflect financial status as of the end of 1999, shows Debtor's liabilities exceeded assets by $392,115.00. Plaintiff's Ex. 13.

Yet another persuasive indicator of Debtor's insolvency is Debtor's bankruptcy schedules. Plaintiff's Ex. 21. These schedules, prepared in connection with the bankruptcy filing on June 1, 2000, show Debtor's liabilities exceeded its assets by $676,373.41. Therefore, as of June 1, 2000, Debtor was still profoundly insolvent.

Viewing all of these financial indicators together—the 1999 tax return, the revised financial statement, and the bankruptcy schedules—the Court is persuaded to find that Debtor was continuously insolvent from January 1, 2000, through the date it filed for bankruptcy. *See Misty Mgmt. Corp. v. Lockwood,* 539 F.2d 1205, 1213 (9th Cir.1976) (applying concept of "retrojection" to allow a court to find a debtor insolvent on a given date when evidence shows debtor was insolvent before that date and all material changes in financial condition are accounted for). *See also Gillman v. Scientific Research Products Inc. of Delaware (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 554–55 (10th Cir.1995) (requiring a showing of insolvency before and after the date in question when using retrojection to determine insolvency). Having proven by a preponderance of the evidence that Debtor was insolvent on March 14, 2000, and all other necessary elements for recovery of the transfer to Defendant under § 548, Plaintiff may avoid the March 14 transfer.

Defendant, as the initial transferee of the debtor's property, is liable to Plaintiff under § 550(a)(1) of the Bankruptcy Code for amount transferred.[7] However, there

---

7. The Bankruptcy Code provides in part:
    (a) ... to the extent that a transfer is avoided under section ... 548 of [the Bankruptcy Code], the trustee may recover, for the benefit of the estate, the property transferred, ... or the value of such property, from—
    (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
    (2) any immediate or mediate transferee of such initial transferee.
    (b) The trustee may not recover under section (a)(2) of this section from—
    (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided ....
11 U.S.C. § 550.

is also an alternative statutory basis for the Court's conclusion that Defendant is liable for recovery of the March 14 transfer. The parties addressed this theory only briefly in their arguments at trial. This alternate approach focuses upon the application of § 550(a)(2) of the Bankruptcy Code to the facts of this case. In addition to recovering from Defendant as an "initial transferee," Plaintiff contends he may also recover from Defendant as an "immediate or mediate transferee." Given the record, the Court agrees.

■ There is a significant difference between the liability of an initial transferee of avoidable transfers as provided in § 550(a)(1), and that of an immediate/mediate, or "subsequent" transferee, as provided in § 550(a)(2). An initial transferee is absolutely liable to the trustee for an avoidable transfer. Subsequent transferees are only liable to the trustee for an avoidable transfer if the requisite elements of value, good faith, or knowledge of avoidability are lacking. 11 U.S.C. § 550(b)(1); *In re Cohen*, 300 F.3d at 1102; *In re Video Depot*, 127 F.3d at 1197–98.

The Ninth Circuit in *In re Cohen* instructs that an initial transferee is one that has dominion over the funds transferred. 300 F.3d at 1102. Certainly Defendant had dominion over Debtor's funds after the transfer. Thus, since the Court above concludes Defendant was the initial transferee of the March 14 payment, its liability to Plaintiff in this case is absolute.

■ However, were the Court to conclude under these facts that Mr. Fox, and not Defendant, initially had dominion over the funds deposited in the Fox account, and that he was "free to invest the whole [amount] in lottery tickets or uranium stocks," *id.*, Defendant would still be liable to Plaintiff for the March 14 transfer as a subsequent transferee of the funds if it

were shown Defendant had knowledge of the avoidability of the transfer.

That Defendant was as a mediate transferee, not the initial transferee, under these facts for purposes of § 550(a)(2) seems logical when measured by standard adopted by the Ninth Circuit's in *In re Video Depot*, 127 F.3d at 1199 (noting other circuits have held a principal may establish legal control and dominion by first directing a transfer into his or her personal bank account and then making the payment from his personal account to the creditor). But, for the reasons set forth below, the Court confidently concludes Defendant knew the March 14 transfer was avoidable. As a result, Defendant cannot benefit from the restrictions on liability found in § 550(b)(1).

■ In the context of § 550(b)(1), a party has knowledge that a transfer is avoidable if the transferee knows the transfer is the result of actual fraud, or knows facts that would lead a reasonable person to inquire further as to the avoidability of the transfer. *Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 195 B.R. 455, 463–64 (N.D.Cal.1996). Further, if a transferee has knowledge of facts that would indicate a particular transfer may be subject to avoidance by a bankruptcy trustee, and if further inquiry would reveal that the transfer is in fact recoverable, the transferee cannot "sit on his hands, thereby preventing a finding that he has knowledge." *Genova v. Gottlieb (In re Orange County Sanitation, Inc.)*, 221 B.R. 323, 328–29 (Bankr.S.D.N.Y.1997) (quoting *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1357 (8th Cir.1995)).

Here, there is no question Defendant had knowledge of the avoidability of the March 14 transfer or, at a minimum, of the salient facts that would lead a reasonable person to inquire further. The trial testimony establishes Defendant's officer, Mr.

Newberry, both generally and in particular during the last few months of Debtor's operations, was aware that Mr. and Mrs. Fox had consistently deposited checks representing corporate accounts receivable into the Fox account. Defendant's agents also knew Mr. Fox was Debtor's primary officer and director, and that he used the Fox account to conduct Debtor's business operations. Mr. Fox testified that his bankers, and especially Mr. Newberry, had an intimate knowledge of Debtor's financial affairs, whether motivated by their desire to provide good customer service to Debtor, or to supervise Defendant's own pecuniary interests.

Further, as the depository bank, Defendant's agents were aware of the source of all the deposits made into the Fox account which were later used to fund the March 14 transfer from Debtor, through the Fox account, to Defendant. While Defendant executive officer testified that bank tellers and other personnel would normally pay little attention to the maker of any checks deposited by Fox into the Fox account, this observation misses the point. Combined with their knowledge that Mr. Fox used this checking account exclusively to operate his business, Defendant was charged with knowledge that the checks being deposited into the account, most of which were made payable to Debtor, represented the proceeds of Debtor's accounts receivable.

Finally, Defendant's agents were also obviously aware the March 14 transfer was being used to satisfy a personal obligation of Mr. Fox, not a corporate debt. As the lender, Defendant was aware the transfer would satisfy Mr. and Mrs. Fox's personal loan, not a corporate obligation.

This combination of facts proves to the satisfaction of the Court that either Defendant had actual knowledge that the March 14 transfer of corporate accounts receiv-ables used to pay the Fox note was potentially avoidable as a fraudulent conveyance in a bankruptcy case, or at the very least, Defendant's agents knew enough about the details of the transfer that further inquiry would have revealed it was potentially avoidable. *Id. See also Video Depot,* 127 F.3d at 1199 (noting that a transferee accepting corporate funds to pay off the personal debt of a corporate director is subject to a higher burden of inquiry).

In sum, the Court concludes Plaintiff is entitled to recover the March 14 transfer from Defendant under not only § 550(a)(1), but also under § 550(a)(2).

## B. The May 24 transfer.

■ Plaintiff seeks to avoid the May 24 transfer based on 11 U.S.C. § 553(b). That portion of the Bankruptcy Code provides in relevant part:

> [I]f a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—
>
> (A) 90 days before the date of the filing of the petition; and
>
> (B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

11 U.S.C. § 553(b)(1). As used in this section of the Code, "insufficiency" refers to the "amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim." 11 U.S.C. § 553(b)(2). Essentially, § 553(b) grants a trustee the power to recover an otherwise valid prepetition setoff by a creditor against a debtor to the

extent the creditor "improves its position" relative to other creditors by setting off within ninety days of the debtor filing for bankruptcy. *Parker v. Community First Bank (In re Bakersfield Westar Ambulance, Inc.)*, 123 F.3d 1243, 1245 (9th Cir. 1997).

In response to Plaintiff's claim, Defendant asserts three separate defenses. First, Defendant argues that it seized the funds in the Fox account pursuant to the security interest it held in Debtor's accounts receivable, and not by offset, and therefore, § 553(b) is inapplicable. Second, Defendant argues it setoff the funds in the Fox account against Mr. Fox's liability on his personal guaranty of Debtor's note, and not to satisfy Debtor's liability. Finally, Defendant argues that mutuality does not exist as required by § 553(b) since the Fox account represented a debt owed by Defendant to Mr. Fox personally, and no obligation was owed by Defendant to Debtor.

█ With respect to Defendant's first defense, Defendant cites a treatise, not cases, for support of the proposition that a bank with a security interest in a deposit account is not subject to § 553(b) when it seizes funds in a debtor's deposit account, because the seizure is an UCC–Article 9 remedy, not a setoff. *See* 3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice 2d* § 63:16 (2002) (discussing jurisdictions that give priority to a creditor with a security interest over a depository bank claiming a right to setoff). However, the Ninth Circuit's *Parker* decision appears to hold just the opposite. 123 F.3d at 1248–49. In *Parker*, the court exam-

ined a bank's offsets against the account of a corporate debtor, based on a loan the bank had made to the debtor that was guaranteed by other parties. *Id.* at 1244. As a defense to the trustee's § 553(b) claim, the bank argued that because it was fully secured, § 553(b) did not apply. *Id.* at 1245–46. The court ultimately found that the bank was undersecured with respect to the collateral pledged by the debtor, and upheld the bankruptcy court's finding that § 553(b) applied regardless of whether the bank's claim against the debtor was secured. *Id.* at 1248–49.

In this case, as in *Parker*, Defendant's claim against Debtor is obviously undersecured when the amount owed by Debtor to Defendant is measured against the value of Debtor's property that Defendant held as collateral for the debt. Under the rule announced in *Parker*, even assuming Defendant's security interest in the Fox account was valid, because Defendant effectively applied its collateral to an undersecured debt, Defendant's first defense fails.[8]

█ Defendant's second defense also misses its mark. It is widely accepted that when a bank has knowledge that a deposit account contains third party funds, it may not offset that account against an obligation of the account owner. B.C. Ricketts, Annotation, *Bank's Right to Apply Third Person's Funds, Deposited in Debtor's Name, on Debtor's Obligation*, 8 A.L.R.3d 235 (1966); *Bellevue State Bank v. Hailey Nat'l Bank*, 37 Idaho 121, 215 P. 126 (1923). *See also Whinnery v. Citizens Nat'l Bank of Stevens Point (In re North-*

---

**8.** The Court acknowledges there is case law to the contrary. *See, e.g., Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278, 289–90 (8th Cir. 1986). However, this Court is compelled to follow the instructions of the Ninth Circuit. The Court also notes that Plaintiff did not dispute the validity of Defendant's security

interest in the funds deposited in the Fox account. Accordingly, the Court presumes without holding that Defendant's security interest was valid, and that it indeed had the right to seize the funds as a secured creditor of Debtor.

*west Liquor Indus., Inc.*), 107 B.R. 616, 620–21 (Bankr.W.D.Wis.1988). As pointed out elsewhere in this decision, Defendant knew the Fox account contained Debtor's funds. In fact, as shown at trial, at the time the offset occurred, the account consisted solely of proceeds of Debtor's accounts receivable.[9] Therefore, Defendant could not legitimately offset funds from that account to satisfy Mr. Fox's personal liability on his guaranty of Debtor's note. To argue otherwise would constitute an admission that Defendant engaged in a legally inappropriate offset, something the Court presumes Defendant did not intend to suggest here. Logically, then, Defendant's offset, as a matter of legal necessity, can be justified by only one theory: that Defendant was using corporate funds as an offset against Debtor's liability on its note to Defendant.

Defendant's final defense focuses on the concept of "mutuality" embodied in § 553. Defendant argues § 553(b) does not apply in this case because mutuality was lacking under the facts. It argues that while Debtor was indebted to Defendant for the loan, Defendant was not indebted to Debtor for funds deposited in the Fox account. As explained below, this in an interesting contention indeed.

Section 553(a) recognizes a creditor's right of offset *provided* mutual debts exist. In other words, the Code does not allow an offset absent mutuality. However, even where a creditor can justify its setoff against a debtor's funds under § 553(a), the trustee is nonetheless entitled to recover that transfer to the extent the creditor improved its position via the offset under the formula found in § 553(b).

Here, Defendant argues it is not responsible to the trustee because mutuality was lacking between the parties, and therefore the May 24 transaction falls outside the reach of § 553(b).

▮ Mutuality requires that "each party must own his claim in his own right severally, with the right to collect in his own name against the debtor in his own right and severally." *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036 (5th Cir.1987) (internal citations omitted). Fundamentally, mutual debts can only exist between the same parties acting in the same capacity. 5 Lawrence P. King, *Collier on Bankruptcy* ¶ 553.03[3][a] (15th ed. rev.2000). At the risk of misstating Defendant's position, it would seem Defendant is asking the Court to find that the offset it effected on May 24, which in order to be valid in the first instance required mutuality, is not subject to the improvement in position provisions of § 553(b) because mutuality was lacking. This Court declines to endorse such contradictory reasoning.

First, as noted above, if Defendant's setoff involved the application of corporate funds to Mr. Fox's personal liability, it was illegal, and the trustee could recover the total amount of corporate funds offset, not just any improvement in position. Again, the Court presumes Defendant would not want the Court to conclude it effected a forbidden offset.

▮ Instead, and contrary to Defendant's analysis, the Court concludes that mutuality did exist under the circumstances. Several facts proven at trial support this conclusion. Defendant had,

---

9. Plaintiff proved all of the money in the Fox account on May 24 was traceable to Debtor in the same way Plaintiff showed all the money in the Fox account on March 14 was traceable to Debtor. The account was overdrawn as of May 8, 2000. Thereafter, only corporate funds were deposited in the account. This analysis leaves no room to doubt that the setoff involved, exclusively, Debtor's funds.

through the frequent contact between Mr. Fox and its officers, a keen understanding of how Debtor conducted its banking practices, including the fact that Debtor used the Fox account as its business checking account. Defendant knew corporate funds were regularly deposited in the Fox account. Plaintiff's counsel also conclusively demonstrated that all of the funds in the account on May 24 were attributable to Debtor's accounts receivable.

Moreover, when Plaintiff's attorneys first contacted Defendant to inquire about the details of the setoff, one of Defendant's senior officers explained in a letter to counsel that Defendant seized the funds by setoff on May 24 and considered the transaction as a taking of corporate money to pay down corporate debt. Plaintiff's Ex. 18. While the author of the letter testified at trial the "opinion" he expressed in the letter came prior to doing any extensive investigation of the facts, and more importantly, prior to consulting Defendant's counsel about the trustee' interest in the transaction, the explanation in the letter actually supplies the most realistic justification for Defendant's conduct. The letter, at a minimum, shows that despite Mr. Fox's technical legal ownership of the Fox account, Defendant's officers presumed the funds in the Fox account were corporate assets that could be used to satisfy Debtor's note. That the bank's attorney later counseled Defendant's officers that this explanation was inherently problematic does not change the analysis.

Taking all these factual findings into account, the Court concludes on May 24 Defendant offset a mutual debt it owed to Debtor against Debtor's liability for amounts due on its own note.[10] *See First Interstate Bank of Idaho v. Gill,* 108 Idaho 576, 701 P.2d 196, 197 (1985) (explaining that a deposit of funds with a bank creates a creditor-debtor relationship, with the bank being the debtor and the depositor being the creditor). As both debts arose before Debtor's bankruptcy, the elements for a mutual setoff have been met. *See Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV,* 209 F.3d 252, 262–63 (3d Cir.2000) (noting a valid setoff requires both debts to have existed prepetition and that the claim and debt be mutual); 5 *Collier on Bankruptcy* ¶¶ 553.03[3][b] and 553.03[3][c][ii] (noting mutuality requires that the claim and the debt exist between the same parties, and that the existence of a fiduciary relationship need not prevent mutuality, as explained by the United States Supreme Court in *Libby v. Hopkins,* 104 U.S. 303, 26 L.Ed. 769 (1881)).

In summary, even though Mr. Fox had personally guaranteed Debtor's note held by Defendant, and even though Defendant held a presumably valid security interest in Debtor's accounts receivable, the Court finds and concludes that via the May 24 setoff, Defendant offset a mutual debt it owed to Debtor as against Debtor's liability on its note owed to Defendant. As a result, the transaction is subject to 11 U.S.C. § 553(b)(1), and Defendant is responsible to Plaintiff if it improved its

10. The Court is mindful of Defendant's admonition that should decisional law interfere with a bank's obligations, as defined by the UCC, banking institutions everywhere may face ruin. Yet, despite Defendant's reference to an impending parade of horribles, the Court is confident that disaster is not imminent. A bank faced with a similar situation can convince the customer to open the proper type of account, and, should the bank be unaware of the problem, the facts would not favor the outcome here. In fact, it is unlikely that many lenders have the level of knowledge that Defendant had in this case, or that any subsequent cases would involve such clear proof that all of the funds offset belonged to the debtor.

position as a result of the offset as provided in § 553(b).

■ To determine whether the May 24 setoff resulted in an improvement in position for Defendant for purposes of § 553(b), a strict mathematical test is employed. *Paragon Dev. Enters., Inc. v. Redding Bank of Commerce (In re Paragon Dev. Enters., Inc.)*, 201 B.R. 254, 258 (Bankr.E.D.Cal.1996) (internal citations omitted). That test compares the value of Defendant's position in relation to Debtor at two different points in time. Applying the statute to this action, the Court must determine the amount by which Debtor's outstanding loan balance to Defendant exceeded the balance in the bank account on a date ninety days before Debtor filed for bankruptcy protection. Then, that same calculation must be made as of the date of the setoff. If the difference between these two amounts declined during this time, the amount of decline represents an improvement in position under § 553(b) and is recoverable by Plaintiff as trustee.

According to the stipulation of the parties, ninety days before Debtor filed, there was an outstanding balance of $135,744.34 on Debtor's loan. On the same day, there was a balance of $24,815.76 in the Fox account. Stipulated Facts, ¶¶ 9, 19, and 20, Docket No. 52. The difference between these amounts, or the "insufficiency" under § 553(b) on that date, is $110,928.58.

On May 24, the date Defendant set off the Fox account against Debtor's loan, the loan balance was $93,627.39 and the Fox account had an ending daily balance of $231.24. Stipulated Facts, ¶¶ 19 and 20, Docket No. 52. Using these figures, Plaintiff calculates the May 24 "insufficiency" to be $93,396.15. By subtracting this sum from the earlier insufficiency, a difference of $17,532.43 results. Plaintiff alleges this is the amount by which Defendant

improved its position and that he is entitled to recover.

However, Plaintiff's interpretation of the statutes and methodology in making the required calculations are flawed. Instead, under § 553(b)(1) and (2), the case law instructs that the insufficiency calculation for the date of setoff must be completed *before* the creditor effects the setoff, not afterwards, as Plaintiff does above. *See Hirsch v. Union Trust Co. (In re Colonial Realty Co.)*, 229 B.R. 567, 576 (Bankr. D.Conn.1999) (calculating the insufficiency on the date of setoff before the setoff was completed); *Official Comm. of Unsecured Creditors v. Am. Sterilizer (In re Comptronix Corp.)*, 239 B.R. 357, 360 (Bankr. M.D.Tenn.1999) (explaining the insufficiency on the setoff date is calculated before the setoff is completed); 5 *Collier on Bankruptcy* ¶ 553.09[2][b] (illustrating, in Example 1, that insufficiency on the date of setoff is to be calculated before the setoff is completed).

Referring to the Fox account bank statements in Plaintiff's Exhibit 3, the account balance on May 24 immediately before Defendant effected the offset was $56,731.24. Subtracting this amount from the loan balance of $93,627.39 yields a properly calculated insufficiency on May 24 of $36,896.15. Comparing the insufficiencies on the two relevant dates ($110,928.58 versus $36,896.15) shows that Defendant's position improved by $74,032.43.

■ The Bankruptcy Code does not always allow the trustee to recover the entire improvement in position. Recovery under § 553(b) is limited to a maximum of the amount offset. 11 U.S.C. § 553(b) ("the trustee may recover ... *the amount so offset* to the extent that" the creditor improved its position) (emphasis added); *Mottaz v. St. Louis Post–Dispatch Pulitzer Publ'g Co. (In re Murphy)*, 203 B.R.

972, 976 (Bankr.S.D.Ill.1997) ("The trustee may then recover the setoff amount to the extent that it improved the creditor's position."); 5 *Collier on Bankruptcy* ¶ 553.09[2][b] (illustrating in Example 6 that recovery is limited to the amount offset). Accordingly, under these facts, Plaintiff may recover from Defendant, at most, $56,500.00, the amount offset.

■ Of course, this analysis is complicated, somewhat, by Plaintiff's request that the Court enter judgment in his favor against Defendant for an amount less than that which the facts and law show he deserves. Despite the erroneous limit Plaintiff placed on his claim against Defendant, it would seem Federal Rule of Civil Procedure 54(c), made applicable to adversary proceedings by Bankruptcy Rule 7054, resolves any question concerning the proper amount of recovery. That Rule instructs that a court, in "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." *See also Samayoa v. Jodoin (In re Jodoin)*, 196 B.R. 845, 851–52 (Bankr.E.D.Cal.1996) (granting relief on a theory not argued under Rule 54(c)), *aff'd on other grounds*, 209 B.R. 132 (9th Cir. BAP 1997); *Parmelee v. Bank of Greensburg (In re L & T Steel Fabricators, Inc.)*, 102 B.R. 511, 520 (Bankr.M.D.La.1989) (awarding a larger recovery than that requested by plaintiff); 10 Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2664 (2002) ("The courts may award damages in excess of those the claimant asked for in the pleadings . . . .").

Despite the seemingly clear, albeit liberal, approach of Rule 54(c) to these facts, the applicability of this Rule may be limited in situations where the failure to request appropriate relief prejudices the adversary's defense of the matter. *In re Jodoin*, 196 B.R. at 851–52. In this context, prejudice would exist only if, upon disclosure to Defendant of the correct amount in controversy, Defendant would have submitted additional evidence at trial not otherwise relevant to the issues actually raised. *Id.* Prejudice would not exist when any additional evidence would have been relevant to issues that were actually raised. *Id.*[11]

Here, the Court is convinced that correction of Plaintiff's computational error in his application of the fairly complex formula contained in § 553(b) would not result in any prejudice to Defendant. Defendant had ample notice that Plaintiff was seeking a recovery as a result of the May 24 setoff based upon the § 553(b) formula. Had it researched the point, Defendant could have located the same authorities cited above to determine the correct manner in which the insufficiency calculation is made.

Moreover, on these facts, the Court concludes no prejudice to Defendant could be shown because there is, in effect, no "new" issue raised by the proper application of the calculation formula as to which any additional evidence could have related. No new theory of recovery is raised here, only the amount of recovery differs. In addition, the facts used by the Court to

---

**11.** In *Jodoin,* a creditor filed an action in the bankruptcy court to determine if a debt was excepted from discharge under 11 U.S.C. § 523(a)(15), which covers nonsupport divorce obligations. Instead, the court concluded the debt should be excepted from discharge under 11 U.S.C. § 523(a)(5) as alimony or support. The court explained that because of the relationship of the two statutory provisions to similar kinds of debts, *i.e.,* debts arising between spouses upon divorce, the debtor was not prejudiced by the application of Fed. R. Bankr.P. 7054/ Fed. R.Civ.P. 54(c). 196 B.R. at 851–852 (citing *Z Channel Ltd. P'ship v. Home Box Office, Inc.,* 931 F.2d 1338 (9th Cir.1991)).

make the calculation, that is the account and loan balances on the different dates, were not disputed by Defendant, but were instead all taken from the parties' stipulated facts. Put another way, any additional evidence Defendant may have introduced had it been apprized that Plaintiff could seek the higher amount would likewise have been relevant to Plaintiff's § 553(b) claim as disclosed, the claim that was actually raised and litigated. Defendant vigorously defended against that claim.

Therefore, in light of clear message of Rule 54(c), and given the nature of Plaintiff's theory of recovery, the Court concludes that Plaintiff is entitled to recoup the full amount of the May 24 setoff, $56,500.00 pursuant to 11 U.S.C. § 553(b).[12]

## IV. Conclusion.

Plaintiff has met his burden of proving that the March 14 transfer to Defendant was a fraudulent transfer pursuant to § 548(a)(1). Specifically, Plaintiff showed the funds in the Fox account used to pay the Fox note were corporate accounts receivable. Because under applicable law Debtor retained an interest in the funds when they were deposited in the Fox account, had that transfer to Defendant not occurred, those funds would have become property of Debtor's bankruptcy estate. Therefore, the transfer from the Fox account to Debtor constituted a transfer of property of the Debtor. Moreover, Plain-

tiff adequately demonstrated that on March 14 Debtor was insolvent, and that Debtor did not receive reasonably equivalent value in exchange for the transfer, which occurred within one year of Debtor's bankruptcy filing.

Defendant is liable to Plaintiff as either an initial transferee or a subsequent transferee under 11 U.S.C. § 550(a)(1) or (a)(2). In accepting the transfer, Defendant had actual knowledge that the transfer was avoidable and knew other facts that would have led a reasonable person to inquire further. Therefore, Plaintiff is entitled to recover $28,908.82 from Defendant.

As for the May 24 transfer, the Court holds, considering all the circumstances, Defendant offset funds of Debtor held in the Fox account against a mutual debt owed by Debtor to Defendant. As a result of the setoff, Defendant improved its position by $74,032.43. Under § 553(b), Plaintiff is entitled to recover the full amount offset by Defendant from the account, $56,500.00. Again, Defendant is liable to Plaintiff for this amount as either an immediate or subsequent transferee per § 550(a)(1) or (a)(2).

Counsel for Plaintiff shall prepare and submit an appropriate form of judgment, consistent with this decision, for entry by the Court. Counsel for Defendant shall approve the form of judgment.

---

12. Defendant's liability to Plaintiff for the avoidable offset under § 553(b) is premised, again, on 11 U.S.C. § 550(a). As a result, for all the reasons explained above by the Court in its analysis of Defendant's liability to Plaintiff for the constructively fraudulent transfer under § 548(a)(1) on March 14, the Court concludes Plaintiff is entitled to judgment against Defendant under either § 550(a)(1) as the "initial transferee" of the offset funds, or under § 550(a)(2) as a "mediate transferee." The Court likewise concludes, on this record, Defendant cannot benefit from the exception to liability provided in § 550(b) because of its extensive actual knowledge of Plaintiff's financial woes and insolvency. This should be clear because Defendant made the decision to effect the offset only after receiving information from Debtor clearly demonstrating Debtor was insolvent on that date.